J-S05045-15

2015 PA Super 54

IN RE: ADOPTION OF: C.D.R.  :  IN THE SUPERIOR COURT OF
                            :         PENNSYLVANIA

APPEAL OF: R.R., NATURAL MOTHER  :  No. 1692 WDA 2014

Appeal from the Order entered September 19, 2014,
in the Court of Common Pleas of Cambria County, Orphans'
Division, at No: 2014-0111 IVT

BEFORE:  DONOHUE, SHOGAN, and STABILE, JJ.

OPINION BY STABILE, J.:                    **FILED MARCH 17, 2015**

R.R. (Mother) appeals from the order entered September 19, 2014, in

the Court of Common Pleas of Cambria County, involuntarily terminating her

parental rights to her minor son, C.D.R. (Child), born in July of 2009.  We

affirm.[1]

On April 18, 2012, Mother was incarcerated as a result of a probation

violation.  Cambria County Children and Youth Service (CYS) filed a

dependency petition on June 1, 2012, and Child was adjudicated dependent

by order dated June 6, 2012.  Physical custody of Child was granted to

Child's maternal aunt during Mother's incarceration.  Mother was released on

July 26, 2012, and Child was returned to her care.  However, Mother was

---

[1] The identity of Child's father (Father) is unknown.  It does not appear from
the record that a petition to terminate Father's parental rights was filed or
that Father's rights were terminated by a previous court order.  We note
that, generally, a minor may not be adopted unless both of his or her natural
parents consent, thereby relinquishing their parental rights.  23 Pa.C.S.A.
§ 2711(a)(3).  A natural parent's consent is unnecessary where that
parent's rights previously have been terminated, or where the court, after
notice and a hearing, determines that grounds exist for involuntary
termination.  23 Pa.C.S.A. § 2714.

again incarcerated for a probation violation on or about October 10, 2012, and Child was placed in foster care. Child has not resided with Mother since that time.

Mother was released on October 18, 2012, but was re-incarcerated from November 28, 2012, until March 30, 2013, because of a drug paraphernalia charge. Mother was once again incarcerated for failing to appear at a probation hearing on October 7, 2013, and remained incarcerated until December 12, 2013. Mother gave birth to a daughter, Child's younger sister, shortly after her release. Finally, Mother was incarcerated for two days starting on December 21, 2013, as a result of a retail theft charge. By order dated January 10, 2014, Child's permanency goal was changed from reunification to adoption, and CYS ended reunification services.[2]

On February 3, 2014, CYS filed a petition to involuntarily terminate Mother's parental rights to Child. A hearing was held on August 13, 2014, during which the orphans' court heard the testimony of CYS caseworker, Barbara Brzana; CYS social worker, Gina Saly; and Mother. On September 19, 2014, the court entered its order terminating Mother's parental rights. Mother timely filed a notice of appeal on October 8, 2014, along with a

---

[2] The record is inconsistent as to the exact dates of Mother's many incarcerations. For the purposes of this summary, we rely on the dates listed in Mother's family service plan documentation, which was entered into evidence at the termination hearing as Petitioner's Exhibit 3.

concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

Mother now raises the following issue for our review: "Whether the [orphans' c]ourt either abused its discretion or committed an error of law when it granted the Petition for Involuntary Termination of Parental Rights, thereby terminating the parental rights of [Mother] relative to [Child?]" Mother's Brief at 2.

We consider Mother's claim mindful of our well-settled standard of review.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing

- 3 -

evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the orphans' court terminated Mother's parental rights pursuant to Section 2511(a)(1), (2), (5), (8) and (b). We need only agree with the orphans' court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004). Here, we analyze the court's decision to terminate under Section 2511(a)(2) and (b), which provide as follows.

> **(a) General Rule.—**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> \* \* \*
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> \* \* \*

**(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

We first address whether the orphans' court abused its discretion by terminating Mother's parental rights pursuant to Section 2511(a)(2).

In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

Instantly, in support of its order terminating Mother's parental rights, the orphans' court adopted a number of factual findings from the juvenile court's January 10, 2014 permanency review order, which changed Child's

permanency goal to adoption. Orphans' Court Opinion, 9/18/2014, at 4. Most notably, the court adopted the findings that Mother has failed to establish and maintain a lifestyle that would permit her to provide long-term care for Child, and that Mother cannot remedy the causes of Child's placement within a reasonable time. *Id.* The court also emphasized that Mother failed to comply with CYS services after she was released from incarceration in March of 2013, and began missing appointments and visits with Child. *Id.* at 5. The court concluded that, while Mother loves Child and has made some progress toward regaining custody, she has not demonstrated consistency, and "cannot adequately support herself, let alone any child." *Id.*

Mother argues that she has been committed to regaining custody of Child, that she has utilized all available resources to achieve that goal, and that she has made progress. Mother's Brief at 4-6. Mother insists that she has remedied her drug addiction and criminal issues, and that she has adequate housing and a support system to assist her. *Id.* at 5, 7, 9-11. Mother also argues that the orphans' court erred by adopting the findings of the juvenile court, rather than making its own findings. *Id.* at 8-9.

After a thorough review of the record in this matter, we conclude that the orphans' court did not abuse its discretion by involuntarily terminating

Mother's parental rights to Child.[3]  CYS caseworker, Barbara Brzana, testified that Mother has a criminal history consisting mostly of retail theft charges.  N.T., 8/13/14, at 10.  Mother was on probation at the time of the termination hearing, and Ms. Brzana explained that all of Mother's criminal charges had been resolved, "except for her most recent ones from May 7th," which were additional retail theft charges.  *Id.* at 10, 43.  Concerning Mother's efforts at reunification with Child, Ms. Brzana testified that Mother, at times, appeared to be making progress.  *Id.* at 23, 36.  At one point, after the petition to terminate Mother's parental rights had been filed, CYS asked that no termination hearing be scheduled in light of Mother's motivation and cooperation.  *Id.* at 36.  However, Ms. Brzana testified that Mother's progress was inconsistent, and that Mother did not complete any of the services offered by CYS, including drug and alcohol treatment, and psychiatric services.  *Id.* at 15-17; Petitioner's Exhibit 2, at 3.  She offered the following explanation:

> . . . . Services have been provided and [Mother] has not been consistently stable in one regard.  Services began in March of 2012.  In less than a month she was incarcerated and her children were placed with her sister.  Upon her release, within four months her children were returned.  In less than two months she was again incarcerated and her children were again placed.  Once she was released in March of 2013, she initially showed some cooperation with the agency and services then

---

[3] We need not consider whether the orphans' court erred by adopting factual findings from the juvenile court's permanency review order.  Even if the orphans' court did err, there was ample evidence presented during the termination hearing to support the court's decision, and the court's error would not require reversal of the order terminating Mother's parental rights.

chose not to comply with drug screens. We would request her to come in. She would show up two days later so we couldn't get a true random drug screen on her.

Her behaviors were inconsistent with sobriety, and [] then after the August 21st hearing, 2013, she totally stopped having communication with the agency and visits with her children. She did not visit with them and was incarcerated due to again refusing the random drug screen and also a scheduled drug screen that our social worker was going to pick her up for on October 3rd. So she was incarcerated on a bench warrant on October 10, 2013, but still did not contact the agency to inquire how her children were doing at that time. It wasn't until myself and the social worker went to the prison to initiate contact between us on October 14th.

She was released on December 12th, at which time she gave birth to [Child's younger sister], and, again, she did inquire and did show promise that she wanted to make change[s], but at that point because of the length of time that [Child] ha[d] been in care, the goal change [hearing] occurred on December 18th. Two days after that she again was incarcerated for more retail theft charges.

In January when [Child's younger sister] was placed with the agency, she did say she wanted to work with the agency. She did show some consistency for the first month, though she did have a positive drug screen for marijuana at that time. She did in January maintain her appointments with the agency social worker and her visitation with the children. In February she began missing sessions with service providers. She had additional criminal charges in the month of February.

In March she, again, continued to miss sessions with the service providers to the point with Alliance Medical Center that they had to put her on a behavioral plan due to missing appointments and because of her behavior with staff at the facility. She tested positive for Benzos in March. In April she continued to have inconsistency with [the Alternative Community Resource Program] and her agency social worker. She was under eviction from her apartment. She continued to test positive for THC. She tried to initiate services within Independent Family Services for home management to assist with the eviction notice and getting her some financial stability.

- 8 -

In May of 2014, she continued to miss sessions, admitted to ongoing use of THC, failed with Independent Family Services, and at that point her mom did step in so the eviction notice was lifted. . . .

N.T., 8/13/14, at 28-30.

Ms. Brzana further testified that, in May of 2014, Mother revoked the releases that allowed CYS to obtain information from Mother's service providers. *Id.* at 21. On May 28, 2014, Mother informed Ms. Brzana that she no longer wanted to have any contact with CYS. *Id.* Thus, Ms. Brzana noted that she had no information regarding Mother's treatment after May. *Id.* at 30.

Concerning visitation, Ms. Brzana testified that Mother's visits with Child were reduced to one per month after Child's permanency goal was changed to adoption. *Id.* at 23-24. However, Mother was given extra visits with Child because she was demonstrating progress toward reunification with Child's younger sister. *Id.* at 23. Mother attended all of her visits from January of 2014 until May 28, 2014. *Id.* at 24. Mother failed to attend all three visits thereafter. *Id.* Mother claimed to Ms. Brzana that one of the visits was missed because Mother had to work. *Id.* at 25. Mother reported that she missed another visit because she thought it was on a different day. *Id.* No reason was offered for missing the third visit. *Id.* Ms. Brzana stated that Mother did not ask to reschedule any of the visits. *Id.* at 26.

CYS social worker Gina Saly testified that she began working with Mother in June of 2013. *Id.* at 48. Ms. Saly was initially assigned to assist

Mother in regaining custody of Child and Child's older brother. *Id.* In December of 2013, Ms. Saly began assisting Mother with respect to Child's younger sister. *Id.* Between June of 2013, and August of 2013, Ms. Saly had four supervised visits with Mother, and three individual social worker sessions. *Id.* at 49. In September of 2013, Ms. Saly scheduled several sessions with Mother, and Mother failed to attend all of them. *Id.* at 50. Mother was incarcerated from October 2013 until December 2013, and Ms. Saly met with her once in prison. *Id.* After Mother's release, from January of 2014 to about March of 2014, Mother was "very committed" to meeting with Ms. Saly. *Id.* at 52. However, during April and May of 2014, Mother's commitment "started to lack," and Mother began to miss sessions. *Id.* at 51-53. Ms. Saly stopped meeting with Mother after May, because the permanency goal of Child's younger sister had also been changed to adoption. *Id.* at 52. Ms. Saly admitted that Mother displayed "a great understanding of parenting skills." *Id.* at 55. However, Mother never completed Ms. Saly's parenting curriculum. *Id.*

Mother testified that she is unemployed, and that she is supported by her boyfriend, with whom she now resides, and family members. *Id.* at 59, 75-76. Mother stated that she travels to a drug and alcohol clinic each weekday, where she attends counseling sessions and receives methadone treatments. *Id.* at 65. Mother noted that she also attends the Alternative Community Resource Program, where she receives therapy and is prescribed medication. *Id.* at 72. Mother conceded that she has a history of retail

theft, but stated that she took "an online class . . . just last month" in order to rehabilitate herself, and that she has not stolen anything since. *Id.* at 79. Mother indicated that she is working toward resolving her criminal issues, and that she is currently attending the Day Reporting Center. *Id.* at 67-69. Mother stated that she began attending the Center two weeks prior to the termination hearing, as a result of one of her criminal charges, and that she is taking classes there in order to obtain her GED. *Id.* at 68-69. Mother claimed that she was subject to drug screens at the Center, and that she has not tested positive for drugs since the previous April, when she tested positive for marijuana. *Id.*

Mother further testified that she had not seen Child since May of 2014. *Id.* at 60. She admitted that visits with Child had been scheduled since May, but that she did not attend the visits because she was upset that her parental rights were being terminated, and she did not know how to say goodbye. *Id.* Mother explained that her compliance with CYS began to slip in March and April of 2014 because she became overwhelmed with everything that she was required to do. *Id.* at 80, 91. Mother blamed her feeling of being overwhelmed on her anxious and depressed mental state. *Id.* Mother claimed that she no longer felt overwhelmed. *Id.* at 80. Mother also stated she contacted CYS every time she missed an appointment and attempted to reschedule. *Id.* at 80-81, 91. Mother testified that she revoked her releases because she felt like CYS was "sabotaging" her efforts

at reunification by only testifying as to the bad things she was doing and not the good things. *Id.* at 92.

Our review of the record supports the orphans' court's conclusion that Mother is incapable of parenting Child, and that her parental incapacity has left Child without essential parental care or control. Additionally, it was reasonable for the court to determine that Mother will not, or cannot, remedy this incapacity. While the evidence presented at Mother's termination hearing establishes that she did make some progress toward reunification with Child, we agree with the orphans' court that Mother has failed to demonstrate consistent improvement. Moreover, at the time of the termination hearing, it appears that Mother had abandoned any attempt at being reunified with Child, by ending her visits, revoking her releases, and by indicating that she no longer wanted to have any contact with CYS. No relief is due.

Next, we consider whether termination was proper under Section 2511(b). Section 2511(b) "focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child." *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010). As this Court has explained, "Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered" as part of our analysis. *In re K.K.R.-S.*, 958 A.2d 529, 533 (Pa. Super. 2008).

"While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child." *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011) (citing *K.K.R.-S.*, 958 A.2d at 533-36).

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*Id.* (quoting *In re A.S.*, 11 A.3d 473, 483 (Pa. Super. 2010)); *see also In re T.D.*, 949 A.2d 910, 920-23 (Pa. Super. 2008), *appeal denied*, 970 A.2d 1148 (Pa. 2009) (affirming the termination of parental rights where "obvious emotional ties exist between T.D. and Parents, but Parents are either unwilling or unable to satisfy the irreducible minimum requirements of parenthood," and where preserving the Parents' rights would prevent T.D. from being adopted and attaining permanency).

Here, the orphans' court concluded that Mother and Child were bonded. Orphans' Court Opinion, 9/18/2014, at 5. However, the court reasoned that termination would not be detrimental to Child, and would best meet Child's developmental, physical and emotional needs and welfare. *Id.* at 5, 7. Mother argues that there was no competent evidence presented to support the orphans' court's determination that termination would be in

Child's best interest, "[a]side from bald assertions from CYS." Mother's Brief at 9-11. Mother contends that Child is already struggling with being separated from her, and states that "severing the bond will certainly have a devastating effect" on Child. *Id.* at 9-12. Mother notes that there was no testimony presented that Child has been harmed by his bond with Mother, or that Child is bonded with his foster parents or to any prospective adoptive parents. *Id.* at 12-13.

Again, we conclude that the record supports the orphans' court's decision to terminate Mother's parental rights. Mother testified that she loves Child, that her visits with Child go well, and that she and Child have a strong bond. N.T., 8/13/14, at 61. Mother also testified that Child calls her "mommy." *Id.* Ms. Brzana agreed that Mother "definitely" loves Child, and that Child loves Mother. *Id.* at 34. However, Ms. Brzana stated that this love should not prevent Child from finding permanency with another family. *Id.* Ms. Brzana emphasized that Mother had failed to attend recent visits with Child, and that Child "has been really verbalizing that he does not feel loved by his mom. Even though as adults we know that is not true, he has a hard time comprehending that because she has not been there for her visits with him." *Id.* Ms. Brzana opined that Child will likely always remember Mother and have some affection for her, but that Child would not be harmed if Mother's parental rights were terminated. *Id.* at 104. She explained that Child had been saying that he wanted "a new mom and dad." *Id.*

Additionally, Ms. Brzana noted that Child was being provided adoption preparation services to ease this transition. *Id.* at 103-04.

Thus, the evidence supports the orphans' court's determination that it would be in Child's best interest if Mother's parental rights were terminated. Admittedly, Child loves Mother, and Mother is correct that there was no evidence presented during the hearing that Child is bonded with his current foster family. Further, there was no testimony as to whether or not Child's current foster placement is pre-adoptive. However, these concerns are outweighed in the instant case by Mother's repeated failure to remedy her parental incapacity, and by Child's need for permanence and stability. ***See T.D.***, 949 A.2d at 920-23; ***J.M.***, 991 A.2d at 325 (quoting ***In re Adoption of R.J.S.,*** 901 A.2d 502, 513 (Pa. Super. 2006)) ("'The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future.'"). Clearly, it would not be in Child's best interest for his life to remain on hold indefinitely in hopes that Mother will one day be able to act as his parent. ***See M.E.P.,*** 825 A.2d at 1276 ("A child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting.") (citations omitted). Regrettably, Mother is not entitled to relief.

Accordingly, because we conclude that the orphans' court did not abuse its discretion by involuntarily terminating Mother's parental rights

pursuant to Section 2511(a)(2) and (b), we affirm the order of the orphans'

court.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/17/2015