J-S22042-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

IN RE: L.C., A MINOR

APPEAL OF: S.C., BIRTH MOTHER

IN THE SUPERIOR COURT OF
PENNSYLVANIA

No. 1977 WDA 2014

Appeal from the Order entered November 7, 2014,
in the Court of Common Pleas of Allegheny County, Civil
Division, at No(s): TPR 034 of 2014

BEFORE:  PANELLA, LAZARUS, and STRASSBURGER*, JJ.

MEMORANDUM BY STRASSBURGER, J.:          **FILED JUNE 03, 2015**

S.C. (Mother) appeals from the order entered November 7, 2014, in
the Court of Common Pleas of Allegheny County, which terminated
involuntarily Mother's parental rights to her minor daughter, L.C. (Child),
born in September of 2012.[1]  We affirm.

At the time Child was born, both she and Mother tested positive for
opiates.  Mother also tested positive for benzodiazepines.  As a result, Child
was placed in the care of the Allegheny County Office of Children, Youth and
Families (CYF) immediately upon her release from the hospital.  Child was
adjudicated dependent by order dated December 12, 2012.

---

* Retired Senior Judge specially assigned to the Superior Court.

[1] The parental rights of Child's putative father, A.C., as well as the parental
rights of any unknown father that Child may have, were terminated by
separate orders entered that same day.  Neither A.C., nor any other alleged
father, is a party to the instant appeal.

On March 3, 2014, CYF filed a petition to terminate Mother's parental rights to Child involuntarily. A termination hearing was held on October 17, 2014, October 23, 2014, and November 6, 2014. During the termination hearing, CYF caseworker Larry Restivo testified that Mother has failed to remedy her drug abuse issues. N.T., 10/17-23/2014, at 47. Most notably, Mr. Restivo explained that Mother had been asked to appear for drug screens 89 times since December 20, 2011. *Id.* at 26. Of those 89 requested screens, Mother refused twice, tested positive 17 times, and failed to appear 41 times.[2] *Id.* Mother's last positive drug screen took place on May 21, 2014. *Id.* Mother tested positive for suboxone and benzodiazepines. *Id.* Mr. Restivo acknowledged that Mother was attending A & R Health at the time the screen was taken, which would explained her positive test for suboxone, but he stated that Mother never has provided him with a prescription for benzodiazepines, despite his requests. *Id.* at 27.

Dr. Anthony Cancilla testified that he discharged Mother from A & R Health because "she was not reliable, she was not making progress, and it would have been malpractice for me to keep her there as a patient." *Id.* at 79-80. Dr. Cancilla stated that Mother "was telling us one thing and what the urines were showing us were another," and that he recommended "emergency hospitalization at a psychiatric hospital on an addiction ward."

---

[2] Mr. Restivo noted that he sometimes did not have a working phone number for Mother, and that Mother would not call him and provide him with a new number. N.T., 10/17/2014 & 10/23/2014, at 34.

Dr. Cancilla was asked about records relating to Mother's treatment at A & R Health, which he provided to CYF, but which were not entered into evidence at the hearing. According to counsel for CYF, Dr. Cancilla's records indicated that Mother tested positive for heroin on August 9, 2014, and that Mother "admitted that she relapsed and that she has used illicit drugs in the past week." *Id.* at 80-82. Dr. Cancilla agreed that, "[i]f it's there, it's accurate" and "you have the corresponding urine report that will show that it was in urine." *Id.* at 80-81. Dr. Cancilla's records also indicated that Mother did not have a documented prescription for benzodiazepines. *Id.* at 82.

Other witnesses to testify included child psychologist Dr. Neil Rosenblum; foster care caseworker Nicole Holtz; and Mother.

On November 7, 2014, the court entered its order terminating Mother's rights. Mother timely filed a notice of appeal, along with a concise statement of errors complained of on appeal.

Mother now raises the following issues for our review.

> 1. Did the trial court abuse its discretion and/or err as a matter of law in permitting Dr. Cancilla to testify in violation of Mother's rights under the Pa. Patient's Bill of Rights and her constitutional rights to privacy as Mother had revoked any prior consent to allow the doctor to divulge any information about his treatment of her[?]
>
> 2. Did the trial court abuse its discretion and/or err as a matter of law in concluding that CYF met its burden of proving by clear and convincing evidence that termination of Mother's parental rights would best serve the needs and welfare of the child pursuant to 23 Pa.C.S. § 2511(b)?

Mother's Brief at 5 (trial court answers omitted).

We first address Mother's claim that the trial court abused its discretion and/or erred by permitting CYF to present the testimony of Dr. Cancilla.

> When we review a trial court ruling on admission of evidence, we must acknowledge that decisions on admissibility are within the sound discretion of the trial court and will not be overturned absent an abuse of discretion or misapplication of law. In addition, for a ruling on evidence to constitute reversible error, it must have been harmful or prejudicial to the complaining party.
>
> An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence or the record, discretion is abused.

**Phillips v. Lock**, 86 A.3d 906, 920 (Pa. Super. 2014) (quoting **Stumpf v. Nye**, 950 A.2d 1032, 1035–36 (Pa. Super. 2008), *appeal denied,* 962 A.2d 1198 (Pa. 2008)).

As noted above, CYF called Dr. Cancilla to testify concerning Mother's time as a patient at A & R Health, where he is employed as a contract physician. N.T., 10/17-23/2014, at 65. According to Dr. Cancilla, A & R Health specializes in using the medications suboxone and subutex, along with counseling, to treat individuals with narcotics addiction. **Id.** at 75. Mother's counsel objected prior to Dr. Cancilla's testimony, stating that Mother "has indicated that while she may have … signed some modified release for him in the past, that she has subsequently revoked that release

- 4 -

and she is exerting her rights under the HIPAA act[3] as well as under the patient's rights and responsibilities act in Pennsylvania code" to prevent Dr. Cancilla from testifying. *Id.* at 58. During Dr. Cancilla's testimony, Mother's counsel again objected, citing HIPAA and the "Pennsylvania patients' rights and responsibilities act," and stating that Mother revoked any release that she may have signed in the past. *Id.* at 66. The court permitted Dr. Cancilla's testimony, explaining, *inter alia*, that "CYF has to prove this case. They have the burden …." *Id.* at 59-61, 68-74.

On appeal, Mother presents a variety of arguments as to why the court acted improperly by permitting Dr. Cancilla to testify. Specifically, Mother contends that the court violated physician-patient privilege pursuant 42 Pa.C.S. § 5929, that the court violated 4 Pa. Code § 255.5(b), and that the court violated Mother's constitutional rights to privacy and confidentiality, as preserved by the "bill of rights for patients" found at 55 Pa. Code § 5100.53. *See* Mother's Brief at 11-13. However, during the termination hearing, Mother objected only on the basis of HIPAA and the "Pennsylvania patients' rights and responsibilities act," bases she does not argue on appeal.[4]

---

[3] "HIPAA" is an acronym commonly used to refer to the federal Health Insurance Portability and Accountability Act of 1996.

[4] Mother does argue that the trial court misinterpreted a section of the Code of Federal Regulations relating to HIPAA. Mother's Brief at 11. However, Mother does not quote or discuss any provision of HIPAA which actually would prohibit Dr. Cancilla from testifying. Additionally, Mother does not cite to the "Pennsylvania patient's rights and responsibilities act," and our research suggests that no such statute exists. It appears that, by referencing the "patient's rights and responsibilities act," Mother's counsel

Thus, Mother has abandoned the preserved bases for her objections to Dr. Cancilla's testimony by failing to raise them in her brief on appeal, and waived the bases she does argue on appeal by failing to raise them in the trial court. **See**, **e.g.**, **Commonwealth v. Cousar**, 928 A.2d 1025, 1041 (Pa. 2007) (quoting **Commonwealth v. Boden**, 159 A.2d 894, 900 (Pa. 1960)) ("The rule is well settled that a party complaining, on appeal, of the admission of evidence in the [c]ourt below will be confined to the specific objection there made."). Accordingly, Mother is entitled to no relief on her first issue.

We now turn to Mother's second issue on appeal, in which she argues that that the trial court abused its discretion by terminating her parental rights to Child involuntarily.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial

---

was referring to 4 Pa. Code § 255.5(b), as he quoted from Section 255.5(b) after again mentioning the "patient's rights and responsibility act" during Mother's testimony. N.T., 10/17-23/2014, at 162. However, it does not appear that Section 255.5(b) pertains to, or derives from, a "patient's rights and responsibility act." Even if it did, the subject provision relates only to the "[p]roject staff" of "projects" operating in connection with the "Governor's Council on Drug and Alcohol Abuse." **See** 4 Pa. Code § 255.5. There is no suggestion in Mother's brief that Dr. Cancilla would qualify as "project staff" under this provision.

court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938, which requires a bifurcated analysis. Here, Mother does not contend that CYF failed to meet its initial burden under subsection 2511(a) of proving that the parent's conduct warranted termination.[5] Accordingly, we turn to

the second part of the analysis pursuant to [subs]ection 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). Subsection 2511(b) provides, in relevant part: "The court in terminating the rights of a parent shall give primary consideration to the developmental,

---

[5] Indeed, the trial court held, and we agree, that CYF proved that Mother's conduct warranted termination under subsections 2511(a)(2) (repeated and continued incapacity to provide parental care based upon causes that will not be remedied by the parent), (a)(5) (child in the agency's care for six months and the causes will not be remedied by the parent within a reasonable period of time, and (a)(8) (child removed from the parent's care for 12 months or more and the conditions which led to removal still exist).

physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). We have explained the analysis under this subsection as follows.

> Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child. … [T]he trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case.

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010) (internal citations and quotation marks omitted).

Here, the trial court concluded that the termination of Mother's parental rights would be in Child's best interest. The court found that Child is bonded with her foster mother, that "Mother is little more than a familiar face to [Child,]" and that Child would not be harmed by the termination of Mother's rights. Trial Court Opinion, 1/26/2015, at 12. In contrast, the court concluded that preserving Mother's rights would be detrimental to Child, as it would deny Child permanency. *Id.*

Mother argues that the trial court did not give "serious consideration [to] the strong attachment, bond and love between Mother and [Child] …." Mother's Brief at 18. Mother emphasizes her testimony during the termination hearing that her visits with Child go well, and that it would be harmful to Child if her parental rights were terminated. *Id.* at 15. Mother also emphasizes the testimony of psychologist Neil Rosenblum, who stated

that there is an attachment between Mother and Child, and that Mother displays appropriate parenting skills. *Id.* at 15-16.

After a thorough review of the record in this matter, we conclude that the trial court did not abuse its discretion by terminating involuntarily Mother's parental rights to Child. During the termination hearing, CYF caseworker Larry Restivo testified that Child was in a preadoptive foster placement, and that Child is bonded with her foster mother. N.T., 10/17-23/2014, at 49. Mr. Restivo agreed that Child's foster placement is "a stable, secure and nurturing environment." *Id.* at 57. He opined that termination of Mother's parental rights would be in Child's best interest. *Id.*

Psychologist Neil Rosenblum testified as an expert in child psychology. *Id.* at 88. Dr. Rosenblum indicated that he conducted an evaluation of Mother and her older child, C., in 2012, and an evaluation of Mother and Child in 2014. *Id.* at 88-89, 92. Dr. Rosenblum explained that Child "was definitely familiar with her mother and responded well to her play activities," and that Mother displayed "appropriate parenting skills." *Id.* He opined that there is attachment between Mother and Child, but not a primary attachment, and noted that Child ran to her foster mother when the evaluation concluded. *Id.* at 93. Dr. Rosenblum stated that he was confident that Child's primary attachment was to her foster mother, and that

foster mother provides Child with "outstanding" care.[6] *Id.* at 94-95, 103. He opined that removing Child from her foster mother would be "very dangerous and potentially emotionally damaging" to Child, and that adoption would be consistent with Child's needs and welfare. *Id.* at 95, 99. Dr. Rosenblum emphasized Mother's poor mental health, and explained that Mother is someone "who just doesn't get it in terms of taking a look at herself and understanding the intensity of problems, … and who is not willing to really work at making significant changes in her personal functioning and in her physical and emotional dependency on drugs or prescribed medication …." *Id.* at 89-90, 98-99.

Mother testified that Child calls her "mommy" and "comes running" toward Mother during visits. *Id.* at 135. Mother stated that she is "closely bonded" with Child. *Id.* at 147. According to Mother, if Child were in her care, her bond with Child would be "way above and beyond" Child's bond with the foster mother. *Id.* Mother insisted that she is a "wonderful mother

---

[6] In his 2014 evaluation, which was admitted as part of CYF Exhibit 4, Dr. Rosenblum noted that Child refers to her foster mother as "Mom-Mom." CYF Exhibit 4, 2014 Evaluation, at 2. Dr. Rosenblum also indicated, in both the 2014 evaluation and his testimony, that Mother is prescribed benzodiazepines in the form of Xanax. *Id.* at 1; N.T., 10/17/2014 & 10/23/2014, at 90-91. Dr. Rosenblum did not specify the source of this information. However, he described Mother's purported prescription for Xanax as "highly questionable given the fact that Xanax is contra-indicated for someone on a prescribed opioid pain medication such as Suboxone." CYF Exhibit 4, 2014 Evaluation, at 10.

that loves my kids and knows what's best for them," and that Child would be harmed if Mother's parental rights were terminated. *Id.* at 135-36, 141.

Thus, the testimony presented during Mother's termination hearing supports the trial court's conclusion that it is in Child's best interest to terminate Mother's parental rights. Child is bonded with her foster Mother, who provides her with exceptional care and support. In contrast, Child never has resided with Mother. Further, while Mother and Child have a bond, it is clear that, under the facts of the instant case, this bond is outweighed by Mother's inability or refusal to remedy her drug addiction, and by Child's need for permanence and stability. *See In re Adoption of C.D.R.*, 111 A.3d 1212, 1220 (Pa. Super. 2015) (concluding that the mother's bond with C.D.R was outweighed by the mother's "repeated failure to remedy her parental incapacity," and by C.D.R.'s need for permanence and stability). No relief is due.

Accordingly, because we conclude that the trial court did not abuse its discretion by terminating involuntarily Mother's parental rights to Child, we affirm the order of the trial court.

Order affirmed.


Judgment Entered.

_____

- 11 -

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>6/3/2015</u>