J-S25002-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: S.S.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: R.W., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 85 WDA 2022 |

Appeal from the Order Entered December 13, 2021
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000084-2021


BEFORE:  BENDER, P.J.E., DUBOW, J., and KING, J.

MEMORANDUM BY BENDER, P.J.E.:          **FILED: September 12, 2022**

Appellant, R.W. ("Father"), appeals from the order entered December 13, 2021, which involuntarily terminated his parental rights to his minor daughter, S.S.W., born in July of 2013.[1]  After careful review, we affirm.

The trial court set forth the relevant factual history of this matter, as follows:

> [S.S.W.] was born [in] July [of] 2013 to [F]ather and mother.[2] The family had a history with Allegheny County [Office of Children, Youth and Families ("CYF")], and at the time prior to removal, CYF was involved with the family due to issues of neglect and truancy. On June 11, 2019, CYF obtained an order for emergency protective custody for [S.S.W].  Mother left [S.S.W.], and her

---

[1] The docket indicates that the trial court's order was filed on December 10, 2021.  However, the docket also shows that the order was not served on the parties until December 13, 2021.  Thus, we consider the order as entered on December 13, 2021.  **See** Pa.R.A.P. 108(b) ("The date of entry of an order in a matter subject to the Pennsylvania Rules of Civil Procedure shall be the day on which the clerk makes the notation in the docket that notice of entry of the order has been given as required by Pa.R.Civ.P. 236(b).").

biological half-siblings, home alone. As a result, criminal charges (endangering the welfare of a child) were filed against mother and the children were removed. At the shelter hearing on June 13, 2019, CYF was ordered to place [S.S.W.] with relatives, as [F]ather could not be immediately located.

[2] Mother has several other children but S.S.W. is her only child with [F]ather. The one-day evidentiary hearing was for CYF's involuntary termination petitions as to mother, the fathers of some of [S.S.W.'s] half[-]siblings, unknown fathers, and [S.S.W.'s] biological [F]ather…. The court entered orders terminating the parental rights of all involved. Father … is the only parent that appeals.

[S.S.W.] was adjudicated dependent on July 17, 2019, and the court made the following findings of fact:

[]CYF has received numerous referrals for the family[,] dating back to 2011. The referrals have been for housing concerns, little food in the home, use of physical discipline, truancy[,] and a lack of supervision…[.] The agency has had an open case since January 2019[,] due to concerns of bed bugs, truancy[,] and lack of supervision…[.] [Father] and mother are married. He is the father of S.S.W. He signed an [acknowledgment of paternity]…. He has not seen [S.S.W.] since she was 18 months old[;] per mother[,] it was more like when she was 7 or 8 months old. He has a significant criminal history[,] including drugs, assaults[,] and firearms. He has served time. Mother testified to significant [intimate partner violence ("IPV")] between him and her. He denies this. His paramour testified that there is no IPV. Frankly, this court thought that Father and his paramour lacked credibility. Father has a medical marijuana card. He and his paramour live in Sojourner House[5] housing…[.] Father's paramour has a CYF history but [it is] unclear what it is. She admits to a lengthy drug and alcohol history but has been in recovery for several years. They have several kids living in their home. Father says he tried to see [S.S.W.]; mother denies this. He stays home with the kids while his paramour works.

[5] Sojourner House is a residential recovery service and program to mothers and their children in the Pittsburgh area. They have a program for permanent housing and supportive services for people in

> recovery, where children can reside with their parents. Father's paramour was in this program and he resided with her there.

The court ordered CYF to investigate the [IPV] allegations made by mother, with respect to [F]ather, and to investigate [F]ather's paramour. The court ordered visitation between [S.S.W.] and [F]ather, three times a week[,] supervised, in his home with permission to move to liberal, unsupervised visits upon agreement of the parties and as [S.S.W.] felt comfortable.

Shortly after the adjudication, the kinship foster home where [S.S.W.] had been placed was no longer a viable arrangement. CYF moved [S.S.W.], along with a biological half-sibling, into a non-relative foster home, which was ratified by court order on July 21, 2019. The following month, the court assumed jurisdiction for the two outstanding truancy citations that had been filed before the magistrate with respect to [S.S.W]. On August 29, 2019, [S.S.W.] was placed in [F]ather's care.

At the first permanency review hearing, on October 17, 2019, this court made the following findings:

> Father continues to live with his fiancé and children. The family recently completed family focus. Father's fiancé refused to screen today. He was positive for [tetrahydrocannabinol ("THC"),] and he has a medical marijuana card. []CYF recently received a report of inappropriate discipline in the home[,] specifically that a belt was being used. Father made some concerning comments about []CYF just coming and taking [S.S.W.] as he was done…[.] [S.S.W.] remains with [F]ather. She is repeating Kindergarten. She is doing well but the school indicated that she could benefit from student assistance programming. The school reports the paperwork was sent home [but F]ather said he never got it.

The court ordered, *inter alia*, that [F]ather should complete the outstanding school paperwork with respect to [S.S.W.], refrain from physical discipline in the home, [F]ather's paramour should undergo drug screens, and CYF should assist the family with resources for winter clothing. The order further stated, "This court is also concerned for the stability of [S.S.W.] if there are more concerning reports the agency is to bring (*sic*) to the court's attention." The court scheduled the next permanency review hearing for January 15, 2020.

- 3 -

On December 17, 2019, CYF obtained an order for emergency protective custody, and a shelter hearing occurred on December 20, 2019. CYF took protective custody of [S.S.W.] after [F]ather had been arrested and incarcerated[] as a result of an incident of domestic violence between him and his paramour. At the shelter hearing, [F]ather remained incarcerated[,] and [S.S.W.'s] mother was unavailable as a placement due to her continued, unresolved issues. Accordingly, the shelter order indicated that [S.S.W.] should remain in care with permission to place with a relative.[6]

> [6] Relative placement was not identified and so [S.S.W.] remains in the care of the Auberle foster home, where her biological half-sister, was also placed. This pre-adoptive foster home has been her placement for the last two years.

After [S.S.W.'s] removal from [F]ather's care, this court held regular permanency review hearings (1/15/20, 1/29/20, 10/21/20, 12/10/20, 2/6/21, 4/21/21, 6/21/21, and 8/19/21). At each and every hearing, the court made specific findings about [F]ather's circumstances and progress[,] and made specific orders about what [F]ather needed to do in order to remedy the conditions that led to removal. Throughout the pendency of the case, Father did not complete a domestic violence or batterers intervention program ("BIP"), did not regularly and consistently visit with [S.S.W.], did not participate in a therapeutic visitation program, and did not attend[] or participate in meetings or appointments for [S.S.W]. In every single court order, except one, this [c]ourt found that [F]ather was … in minimal compliance with the family service plan and had made minimal progress [in] remedying the conditions that led to removal.

CYF filed an involuntary petition to terminate [F]ather's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), (5), and (8)[,] and (b)[,] on or about May 4, 2021. At the time of the termination of parental rights proceedings, [S.S.W.] was eight years and five months old[,] and had been out of [F]ather's care for the last twenty-four months.

Trial Court Opinion ("TCO"), 2/15/22, at 2-6 (internal citations, brackets, and some footnotes omitted).

On December 13, 2021, following a hearing, the trial court entered an order terminating Father's parental rights pursuant to Section 2511(a)(2), (5), and (8), and (b).[2] On January 12, 2022, Father filed a timely notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i). Thereafter, the trial court issued its Rule 1925(a) opinion.

Father raises two issues for our review:

1. Did the trial court abuse its discretion and/or err as a matter of law in granting the petition to involuntarily terminate Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), (5), and (8)?

2. Did the trial court abuse its discretion and/or err as a matter of law in concluding that CYF met its burden of proving by clear and convincing evidence that termination of Father's parental rights would best serve the needs and welfare of [S.S.W.] pursuant to 23 Pa.C.S. § 2511(b)?

Father's Brief at 8.[3]

Before delving into Father's arguments, we acknowledge that:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial

---

[2] The trial court explained that, due to a scrivener's error, its December 13, 2021 order mistakenly indicates that termination was also granted under Section 2511(a)(1). **See** TCO at 9. The trial court subsequently amended the order to correct this error on February 9, 2022.

[3] We note that S.S.W. has also filed an appellate brief in this matter, in which she opposes the termination of Father's parental rights.

court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1215 (Pa. Super. 2015) (citation omitted).

In addition, we observe that:

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.[] §§ 2101–2938, which requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*C.D.R.*, 111 A.3d at 1215 (citation omitted).

In the case *sub judice*, the trial court terminated Father's parental rights pursuant to Section 2511(a)(2), (5), (8), and (b). We need to only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm its decision. *See id.* (citations omitted). Here, we evaluate the trial court's decision to terminate under Section 2511(a)(5) and (b), which provide as follows:

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\*\*\*

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

\*\*\*

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(5), (b).

First, in terminating Father's parental rights under Section 2511(a)(5),

the trial court explained:

[S.S.W.] was first removed from her mother's care one month shy of her sixth birthday. At the time of this first removal, mother had left [S.S.W.] and her biological siblings home alone, resulting in criminal charges, specifically endangering the welfare of children. Father could not be reached for placement and so [S.S.W.] was placed in a kinship foster home. Mother alleged that [F]ather had not been involved with [S.S.W.] since she was seven or eight months old; [F]ather contended that his last contact with [S.S.W.] was when she was approximately eighteen months old. In either situation, when this case came to the court's attention, [F]ather had not been involved or parented [S.S.W.] for the bulk of her life.

[S.S.W.] was placed into [F]ather's care shortly after her dependent adjudication but there were immediate concerns regarding [F]ather's care. Four months later, CYF took emergency protective custody because [F]ather had been arrested and incarcerated for an incident of domestic violence with this paramour. This arrest was a violation of his probation[] related to prior criminal matters, and rendered [F]ather incarcerated for a period of time.

Father's identified goals included completing a [BIP], to work with a family support partner through the CYF Dad's program[,] to visit and maintain his relationship with [S.S.W.], and to attend meetings and appointments related to [S.S.W].

Father had a goal to address domestic violence concerns by completing a [BIP]. There had been a final protection from abuse order entered between mother and [F]ather in February 2015, and in December 2019, [F]ather was involved in an incident where he was subsequently charged with strangulation of his paramour. CYF referred [F]ather to the Women's Center and Shelter [("WCS")] several times. The caseworker testified that [F]ather "did not think that he had a problem with beating women or anger or violence." Father started the [WCS's] Domestic Violence 101 class, which the caseworker described as "an educational seminar about healthy relationships." However, [F]ather discontinued attendance when he was informed this would not satisfy the requirement of attending [BIP]. Per caseworker testimony, [F]ather attended four of ten WCS sessions over a two-month period. Father never provided any proof that he completed a [BIP] during the pendency of the case or at the time of the termination proceeding. The CYF caseworker testified that the agency had continued concerns about [F]ather's violence, specifically concerns of inappropriate physical discipline, as [S.S.W.] presented with bruises and reported being beaten by [F]ather after briefly being in his care. Additionally, the caseworker testified that they received recent information that led them to believe that domestic violence continued to be a relevant and current issue for [F]ather.

Father had a goal to work with a family support partner ("FSP") through the CYF Dad's Program. The CYF caseworker testified that [F]ather said he did not want to meet with this service. Father did not complete this goal[,] nor did he provide any evidence or testimony of completing a similar goal throughout the pendency of the case or at the time of the termination hearing.

Father had a goal to visit with [S.S.W.] and maintain a relationship with [S.S.W]. Father did not regularly or consistently avail himself for visits with [S.S.W.], which is clearly ascertained upon a review of CYF Exhibit 3 – Visit Logs. Father's reasons for not attending visits were varied, and documented, within the visitation log. Father failed to confirm visits; [F]ather did not show up for virtual visits; [F]ather alleged he did not have transportation or childcare for other children; [F]ather showed up late; [F]ather left early; and [F]ather alleged to have back pain. The CYF caseworker testified that [F]ather was referred to the [Three Rivers Adoption Council's ("TRAC")] therapeutic visitation program three separate times[.][7] … The caseworker testified that [F]ather appeared to show interest in participating but never followed through with any of the referrals, and later indicated to CYF that he did not think he needed this service. At the time of the termination proceeding, [F]ather's visitation had not expanded beyond supervised visitation. The CYF caseworker testified that [F]ather failed to show demonstrated interest or consistency in visitation.

> [7] TRAC['s] therapeutic visitation program, also known as their TSV (therapeutic supervised visitation) program, allows for family visitation in a safe and nurturing environment, where parents can receive feedback and coaching to facilitate reunification and strengthen parenting skills.

Father had [a] goal to attend and participate in any meetings or appointments for [S.S.W]. The CYF caseworker testified that [F]ather was made aware of doctor appointments ahead of time and did not participate or engage in meetings or appointments. In fact, the overall lack of involvement and progress by either mother or [F]ather gave rise for the court to appoint [S.S.W.'s] foster mother as educational and medical decision[-]maker in October 2020.

This court, and CYF via their family service plans, provided a roadmap for [F]ather to address the issues that led to [S.S.W.'s] removal from his care — of primary concern, issues regarding physical violence in the home. These concerns, which existed at the time of removal, had not been remedied at the time of the termination proceeding, at which point [S.S.W.] had been in care [for] twenty-four consecutive months. Moreover, there was a lack of any credible evidence or testimony that [F]ather could, or would, be able to remedy the conditions with[in] the foreseeable future.

TCO at 9-13 (internal citations omitted).

Father challenges the trial court's reasoning, arguing that "there was not clear and convincing evidence that Father failed to remedy the conditions that placed S.S.W. into care. S.S.W. had been placed in Father's care and was removed because Father was incarcerated. But for the incarceration, CYF expected S.S.W. to remain in Father's care." Father's Brief at 15. Father emphasizes that he "was deemed appropriate for placement before his incarceration and there was no evidence establishing a nexus between the incident that led to Father's incarceration in 2019 and Father's inability to care for S.S.W." *Id.* at 19. In addition, he says that "[t]estimony from CYF was unclear as to why Father needed BIP or IPV services to successfully parent S.S.W.[,]" as "there was no evidence that S.S.W. was a victim of abuse, that S.S.W. witnessed any domestic violence involving Father, or that S.S.W. was in any way psychologically affected by the domestic violence that concerned CYF." *Id.* at 15-16.

No relief is due. The trial court noted that S.S.W. was removed from Father's care due to issues regarding physical violence in the home. *See* TCO at 13. It determined that Father had not remedied these conditions, noting that a CYF caseworker testified that she continued to have concerns about Father's violence, and that CYF had received information leading it to believe that domestic violence remains an issue for Father. *See id.* at 11, 13. Additionally, the trial court noted that CYF had concerns pertaining to Father's inappropriate physical disciplining of S.S.W., as she presented with bruises

and reported being beaten by Father while in his care. *Id.* at 11. The trial court also observed that Father never provided any proof that he completed a BIP. *Id.* Furthermore, we agree with the trial court that there was no credible evidence or testimony that Father could, or would, be able to remedy his issues with physical violence within a reasonable period of time, given his lack of consistent effort thus far. *Id.* at 13. Accordingly, we reject Father's argument, as the record supports the trial court's decision with respect to Section 2511(a)(5).

Second, we consider whether termination was appropriate under Section 2511(b). This Court has explained:

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> > In addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*C.D.R.*, 111 A.3d at 1219 (cleaned up).

Here, with respect to Section 2511(b), the trial court opined:

- 11 -

Father was scheduled to have an individual evaluation and interactional evaluation with [S.S.W.] on July 22, 2021, with Dr. Patricia Pepe. Father failed to attend both the individual and interactional evaluation. In deciding whether termination would best serve [S.S.W.'s] needs and welfare, the court reviewed the findings of fact[] within the court orders, the information within the visitation logs, the interactional evaluation conducted by the court[-]appointed evaluator, and the testimony of [F]ather, which this court found to be largely lacking in credibility.

Father's testimony blamed others and deflected any responsibility he had to address his goals, provide documentation of compliance, [and] attend and participate in visitation. The evidence suggested [that] there was a lack [of] consistent interest and investment in reunifying with his daughter. Father minimized concerns regarding domestic violence or his need to attend a [BIP]. In the two months leading up to the termination of parental rights proceeding, [F]ather failed to attend a single visit with his daughter. Father's overall involvement and visitation throughout the case was so sporadic that the court appointed [S.S.W.'s] foster parent to serve as educational and medical decision[-]maker in order to address [S.S.W.'s] special education needs. To be fair, it was the court's opinion that [F]ather demonstrated the most honesty in his testimony when answering a question posed by his counsel — what did he believe was in [S.S.W.'s] best interest — to which [F]ather stated, "I believe the best for her welfare is for her to -- for her to be with a family member and assist them."

Dr. Patricia Pepe, the court[-]appointed evaluator, conducted an interactional evaluation between [S.S.W.] and her foster mother.[8] Father was scheduled to have an individual evaluation and interactional evaluation with [S.S.W.] but failed to attend. In the interactional evaluation, Dr. Pepe noted that [S.S.W.] refers to the foster mother as "mommy" and was exhibiting "positive functioning." Dr. Pepe noted that [S.S.W.] had been in care for a long time, with an "unstable and unknown future[,"] and found that this foster parent had accepted [S.S.W.] into a home environment that met her needs and gave her an opportunity to excel. Dr. Pepe recommended that [S.S.W.] remain in her current home on a permanent basis through adoption.

[8] The interactional evaluation between [S.S.W.] and her foster mother also included [S.S.W.'s] older, half-biological sibling, who is placed in the same home.

- 12 -

[S.S.W.] lived with her mother until her removal right before her sixth birthday. She spent only a few months in [F]ather's care during which time she alleged physical discipline and had bruising. Ultimately, she was removed from [F]ather's care due to violence in the home for which he was arrested. Not only did [F]ather fail to provide an explanation for the lack of progress on his goals, [F]ather did not overcome the evidence that overwhelmingly supported the conclusion that [S.S.W.'s] need for stability and permanency far outweighed any potentially negative impact that could occur as a result of terminating [F]ather's rights.

TCO at 13-15 (internal citations omitted).

Father argues that "[t]he record does not include sufficient evidence to support a determination that termination of Father's parental rights best serves the needs and welfare of S.S.W." Father's Brief at 21. Specifically, he complains that the record does not include any expert opinion supporting such a conclusion, and that "the only witness to testify as an expert admitted that she was unaware that S.S.W. had been placed with [F]ather in 2019." *Id.* Father says that, "[w]ithout observing Father with S.S.W., the psychologist could not assess the attachment between S.S.W. and Father. As a result, she could not advise the court how termination of Father's parental rights would affect S.S.W." *Id.* In addition, Father emphasizes that S.S.W. opposes the termination of his parental rights and wants to be reunified with him. *Id.* He notes that S.S.W. calls him "Dad" and always asks to visit with him and her paternal half-siblings. *Id.* at 21-22.

No relief is due on this basis either. First, with respect to the lack of expert opinion in the record regarding the attachment between S.S.W. and Father, the trial court noted that Dr. Pepe was supposed to evaluate Father,

but Father failed to attend the scheduled evaluation. TCO at 15. Second, regarding S.S.W.'s wish to be reunified with Father, the bond between a parent and child is "only one of many factors to be considered by the court when determining what is in the best interest of the child." **C.D.R.**, 111 A.3d at 1219 (citation omitted). Further, the record supports the trial court's determination that termination will best serve the needs and welfare of S.S.W. As CYF aptly points out,

> any attachment S.S.W. feels toward Father is primarily felt in one direction. Father has failed to comply with court[-]ordered and agency[-]established goals designed to address and alleviate concerns of continued IPV; failed to participate in S.S.W.'s life in a parenting role by attending meetings or appointments; and failed to establish and maintain a relationship with her through consistent visitation, including not visiting at all in the two months leading up to the [termination of parental rights hearing].

CYF's Brief at 41-42 (citation omitted). We agree.

Accordingly, because we conclude that the trial court did not err or abuse its discretion by involuntarily terminating Father's parental rights pursuant to Section 2511(a)(5) and (b), we affirm the trial court's order. Father is not entitled to relief.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date:  09/12/2022