J-S44016-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: J.V.S., A MINOR, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| APPEAL OF: J.K.G. A/K/A J.G. A/K/A J.S., MOTHER | |
| | No. 146 EDA 2017 |

Appeal from the Decree Entered December 19, 2016
In the Court of Common Pleas of Philadelphia County
Family Court at No(s): CP-51-AP-0000708-2016, CP-51-DP-0002513-2014

| | |
|---|---|
| IN THE INTEREST OF: J.H.G., A MINOR, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| APPEAL OF: J.K.G. A/K/A J.G. A/K/A J.S., MOTHER | |
| | No. 147 EDA 2017 |

Appeal from the Decree Entered December 19, 2016
In the Court of Common Pleas of Philadelphia County
Family Court at No(s): CP-51-AP-0000709-2016, CP-51-DP-0002516-2014

| | |
|---|---|
| IN THE INTEREST OF: A.R.G., A MINOR, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| APPEAL OF: J.K.G. A/K/A J.G. A/K/A J.S., MOTHER | |

|  | No. 148 EDA 2017 |
|---|---|

Appeal from the Decree Entered December 19, 2016
In the Court of Common Pleas of Philadelphia County
Family Court at No(s): CP-51-AP-0000710-2016, CP-51-DP-0002515-2014

| IN THE INTEREST OF: A.B.G., A MINOR,<br><br>Appellee<br><br><br>APPEAL OF: J.K.G. A/K/A J.G. A/K/A J.S., MOTHER | IN THE SUPERIOR COURT OF PENNSYLVANIA<br><br><br><br><br><br>No. 149 EDA 2017 |
|---|---|

Appeal from the Decree Entered December 19, 2016
In the Court of Common Pleas of Philadelphia County
Family Court at No(s): CP-51-AP-0000711-2016, CP-51-DP-0002514-2014

| IN THE INTEREST OF: N.S., A MINOR,<br><br>Appellee<br><br><br>APPEAL OF: J.K.G. A/K/A J.G. A/K/A J.S., MOTHER | IN THE SUPERIOR COURT OF PENNSYLVANIA<br><br><br><br><br><br>No. 150 EDA 2017 |
|---|---|

Appeal from the Decree Entered December 19, 2016
In the Court of Common Pleas of Philadelphia County
Family Court at No(s): CP-51-AP-0001180-2016, CP-51-DP-0002519-2014

J-S44016-17

| IN THE INTEREST OF: F.J.W., A MINOR, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| APPEAL OF: J.K.G. A/K/A J.G. A/K/A J.S., MOTHER | |
| | No. 151 EDA 2017 |

Appeal from the Decree Entered December 19, 2016
In the Court of Common Pleas of Philadelphia County
Family Court at No(s): CP-51-AP-0001181-2016, CP-51-DP-0002517-2014

BEFORE:  BENDER, P.J.E., SHOGAN and MUSMANNO, JJ.

MEMORANDUM BY SHOGAN, J.:                    **FILED JULY 21, 2017**

J.K.G., a/k/a J.G. a/k/a J.S. ("Mother") appeals from the decrees involuntarily terminating her parental rights to her six children:  F.J.W. (born December of 2001), A.R.G. (born December of 2003), J.V.S. (born March of 2005), J.H.G. (born August of 2006), A.B.G. (born February of 2011), and N.S. (born September of 2014) (collectively, "the Children").[1]  After careful consideration, we affirm.

The trial court set forth the following findings of fact in its opinion to this Court:

_____

[1]  F.J.W.'s biological father is deceased.  F.J.W.'s stepfather, J.S., is the biological father of the other five children.  J.S. appealed the decrees terminating his parental rights to his five children at 335 EDA 2017, 339 EDA 2017, 344 EDA 2017, 351 EDA 2017, and 357 EDA 2017.  We address J.S.'s appeals in a separate memorandum.

- 3 -

On August 23, 2006, the family became known to [DHS] through a General Protective Services (GPS) report alleging that Mother had recently given birth to J.H.G. and that J.H.G. had been delivered by a midwife at Mother's house. The GPS [report] alleged that Mother refused to take J.H.G. to the hospital for an examination because Mother did not want to pay medical fees. On November 14, 2006, DHS received a GPS [r]eport which alleged that another child [J.S.] had language and motor delays and was left unattended in a crib for extended periods of time. The GPS [r]eport also alleged that Mother had made no plans to make areas of her house safe for J.H.G.

On October 24, 2014, DHS received a GPS report alleging that another child "F.J.W." was not receiving appropriate supervision from Mother. . . . This GPS report also alleged that F.J.W. was not attending school, and was often left alone to supervise his siblings.

On Friday October 24, 2014, DHS visited the family's home. DHS learned that F.J.W., J.S., and A.R.G. were home alone and summoned the police. Mother arrived at the house one hour after DHS entered the home. DHS observed the house to be in a deplorable condition. There was a large hole in the ceiling and the house smelled of cat urine. DHS learned that six children slept on one mattress that was dirty and covered with cat feces and urine. Dirty laundry was strewn throughout the house in piles up to the ceiling. The house was infested with bugs. DHS learned that Mother and father "J.S." . . . had another child named [V.S.] who died from carbon monoxide poisoning in 2009. DHS immediately obtained an Order of Protective Custody ("OPC") for the Children. The Children were transported to the Children's Hospital of Philadelphia ("CHOP"). It was determined at CHOP that N.S. had an enlarged head and no record of immunizations. Furthermore, there was no record of the Children receiving any immunizations since the year 2009. During a medical examination it was discovered that A.R.G. had a severe case of head lice and significant ear pain. On October 25, 2014, F.J.W. and A.R.G. were placed together in a separate foster home from their siblings. It was also learned that F.J.W., J.S., [and] A.R.G. were inconsistent with school attendance. On February 2, 2015, the Community Umbrella Agency ("CUA") Asociacion De Puertorriquenos En Marcha ("APM") held a Single Case Plan ("SCP") meeting. The goal identified for the Children was to return to Mother [and J.S. (Father)]. Parents were asked

to clean their home. On November 14, 2014, an adjudicatory hearing was held before the Honorable Jonathan Irvine. The Children were adjudicated dependent. On March 20, 2015, CUA revised the SCP. The goal for the Children was to return to parents. The goal[s] for parents [were] (1) to clean the house; (2) to keep all supervised visits; (3) to attend the Achieving Reunification Center ("ARC") program; (4) to explore new suitable housing; (5) to attend CEU [Clinical Evaluation Unit] appointments; [and] (6) to receive a Parenting Capacity Evaluation ("PCE").

At a permanency review on September 10, 2015, it was testified that child J.S. has been diagnosed with autism. Child A.B.G. was diagnosed with Adjustment Disorder. Child F.J.W. was also diagnosed with autism. At that time, Mother was not cooperating with mental health treatment. However, Mother . . . had completed parenting education classes at the ARC program. On December 8, 2015, A PCE was conducted for each parent. In summary, the PCE report stated that . . . Mother . . . failed to grasp [her] responsibilities to [the] Children.

Trial Court Opinion, 3/10/17, at 3–5 (internal citations omitted).

The Department of Human Services ("DHS") filed petitions to terminate Mother's parental rights to her five younger children on August 8, 2016, and to F.J.W. on December 2, 2016.[2] The trial court held a hearing on December 19, 2016, at which Mother was present and represented by counsel. After receiving testimony and exhibits, the trial court found clear and convincing evidence to involuntarily terminate Mother's parental rights to all six children pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). The trial court also changed the permanency goals for the five younger

_____

[2] The petition regarding F.J.W. was filed later due to a delay in obtaining the death certificate of his biological father.

children to adoption. Mother filed the instant appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b).[3]

On appeal, Mother presents the following questions for our review:

A. Whether the trial court erred in involuntarily terminating the Mother's parental rights where it was not supported by clear and convincing evidence when the Mother completed a substantial portion of her FSP/SCP goals?

B. Whether the trial court erred in involuntarily terminating the Mother's parental rights where it was not supported by clear and convincing evidence and that the parenting capacity evaluation had no merit and was not credible?

C. Whether the trial court erred in involuntarily terminating the Mother's parental rights where there was [sic] the bonding evaluation was incredible in that the Mother had consistently visited her children and there was a bond between the Mother and [the] Children and the termination of parental rights would have a negative effect on the developmental, physical and emotional needs of the [C]hildren?

Mother's Brief at 5 (extraneous capitalization omitted).

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial

---

[3] Although Mother's notices of appeal refer to the termination decrees and the goal-change orders, Mother did not raise any issues involving the goal-change orders in her Pa.R.A.P. 1925(b) statement. Therefore, we conclude that Mother has waived any challenge to the goal-change orders. *See In re L.M.*, 923 A.2d 505, 509 (Pa. Super. 2007) (explaining that failure to include issue in Rule 1925(b) statement results in waiver).

court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101–2938, which requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). We need agree with the trial court as to only one subsection of Section 2511(a), as well as 2511(b), in order to affirm an involuntary termination order. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

Here, the trial court terminated Mother's parental rights under Section 2511(a)(1), (2), (5), (8), and (b). We analyze the trial court's decision to terminate under Section 2511(a)(2) and (b), which provide as follows:

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2) and (b). We have held that:

[i]n order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa. Super. 2015) (reformatted; citations and internal quotation marks omitted).

Mother first challenges the termination of her parental rights because "she substantially completed her Family Service Plan Objectives." Mother's Brief at 9. Specifically, Mother mentions that "she worked a variety of job[s]," "improved her housing," and "attended a parenting café." *Id.* at 10–11. Upon review, we discern no abuse of the trial court's discretion or error of law in terminating Mother's parental rights to the Children pursuant to Section 2511(a)(2).

The record confirms that Mother has demonstrated repeated and continued neglect, causing the Children to be without essential parental care, control, or subsistence necessary for their physical or mental well-being. Specifically, DHS was first introduced to the family in August of 2006, at which point DHS received a report that J.H.G. had been delivered at home by a midwife and Mother refused to take her to the hospital for an examination because she did not want to pay the medical fees. Petition for Termination of Parental Rights, 8/8/14, Exhibit A (Statement of Facts) at ¶ a. The report further disclosed that J.V.S. was left unattended in a crib or playpen for extended periods of time, he "banged" his head against these objects, and he had chipped teeth; Mother was unwilling to make these areas safe for J.V.S. *Id.* at ¶ b.

In 2009, Mother and Father's son, V.S., died of carbon monoxide poisoning, but they did nothing to ameliorate the condition and make the house safe. Petition for Termination of Parental Rights, 8/8/14, Exhibit A (Statement of Facts) at ¶ d; N.T.,12/19/16, at 71–72. Five years later, DHS learned that F.J.W. was not receiving appropriate supervision; he was truant; and he was often left alone to supervise his younger siblings. Petition for Termination of Parental Rights, 8/8/14, Exhibit A (Statement of Facts) at ¶ c; N.T., 12/19/16, at 7. Upon visiting the family home in October of 2014, DHS discovered F.J.W., J.V.S., and A.R.G. alone, living in deplorable, bug-infested conditions. Mother tried to persuade DHS that she had been in the house but that she did not hear the DHS agents arrive. Petition for Termination of Parental Rights, 8/8/14, Exhibit A (Statement of Facts) at ¶ d.

Moreover, N.S. had an enlarged head, multiple medical conditions, and no immunizations; there were no immunization records for the other children since 2009. Petition for Termination of Parental Rights, 8/8/14, Exhibit A (Statement of Facts) at ¶ i; N.T., 12/19/16, at 8–9, 111. A.R.G. had a severe case of head lice and chronic ear pain. Petition for Termination of Parental Rights, 8/8/14, Exhibit A (Statement of Facts) ¶ j; N.T., 12/19/16, at 10. F.J.W. did not attend school during the 2014–2015 school year, and three of the siblings were receiving truancy prevention services. Petition for Termination of Parental Rights, 8/8/14, Exhibit A (Statement of

Facts) at ¶ o. In May of 2015, after the Children were in care, DHS received a substantiated report that "[Mother and Father had] padlocked [the Children] in a bedroom without adult supervision, and that the [C]hildren were scratching on the window for . . . help. The report also alleged that [Mother and Father] had restrained [the Children] in a playpen with plywood covering the top." Petition for Termination of Parental Rights, 8/8/14, Exhibit A (Statement of Facts) at ¶ v; N.T., 12/19/16, at 43–44.

Additionally, Mother has demonstrated repeated and continued incapacity and refusal, causing the Children to be without the essential parental care, control, or subsistence necessary for their physical or mental well-being. Specifically, during the two years following the Children's placement, Mother failed to obtain mental health treatment or suitable housing contrary to DHS' recommendations and referrals. N.T., 12/19/16, at 11–12, 39, 47, 108–109. Although Mother claimed that she had obtained mental health treatment at PATH, she provided no documentation, and PATH had no record of Mother attending their program. *Id.* at 12–13, 20, 95. Additionally, although Mother submitted a lease to DHS on the day of the termination hearing, she was awaiting a site visit by DHS and needed additional funding in order to move into the apartment. *Id.* at 14, 16–18, 50–51, 109–110. Also, Mother failed to schedule an appointment at CHOP to receive vital training on how to care for N.S., who was diagnosed with multiple medical conditions and required a feeding tube. N.T., 12/19/16, at

9–10, 15, 47–49. Disturbingly, Mother would consistently fail to sign consents for medications for the Children, and she interfered with their medical treatments by canceling appointments without informing DHS or the foster parents, which was in violation of a court order. *Id.* at 31–35, 37. Moreover, Mother showed no interest in the Children's medical conditions and failed to take an active role in their treatments. *Id.* at 28–30, 33, 36, 48. Regarding visitation, Mother was restricted to supervised, line of sight/line of hearing visits. *Id.* at 37–39. She attended only twenty-four of the thirty-four scheduled visits, due in part to scheduling conflicts, and she brought food that was adverse to N.S.' myriad medical conditions. *Id.* at 15, 18–19, 63–66, 92. Furthermore, Mother interfered with the relationship between the Children and the foster parents by showing up unannounced at the foster home and the Children's school. *Id.* at 38. Finally, nothing in the record indicates that Mother can or will remedy the conditions and causes of her neglect, incapacity, and refusal to provide parental care. Based on the foregoing, therefore, we agree with the trial court that there exists clear and convincing evidence of record to justify the termination of Mother's parental rights to the Children pursuant to Section 2511(a)(2).

Next, Mother challenges the termination of her parental rights because "the parenting capacity evaluation did not have any merit." Mother's Brief at 12. Mother discredits the evaluation because the evaluator "did not observe [Mother] with her children" and believed that Mother had the capacity to

parent "but did require supportive services in order to do so." *Id.* at 12–13. Our standard of review requires us to accept the trial court's findings of fact and credibility determinations where they are supported by the record. *See In re T.S.M.*, 71 A.3d at 267.

Dr. Erica Williams performed the parenting evaluation. In Dr. Williams' expert opinion, Mother refused to take responsibility for the Children's placement, demonstrated chronic and extended neglect of the Children, interfered with the Children's relationship with the foster parents, and was incapable of ever being a responsible parent. N.T., 12/19/16, at 69–80, 86–87. The trial court deemed Dr. Williams' testimony "to be credible" and "accorded [it] great weight." Trial Court Opinion, 3/10/17, at 9. Our review confirms that the trial court's findings of fact and credibility determinations are supported by the record. Accordingly, we decline to reweigh the evidence and reassess witness credibility.

Lastly, Mother challenges the termination of her parental rights as improper under Section 2511(b) because "there was a strong bond between [her] and her children" and the trial court did not hear the desires of her

older children. Mother's Brief at 15.[4] In response, the Children's guardian *ad litem* ("GAL") asserts, "The mere existence of an emotional bond does not preclude the termination of parental rights." GAL's Brief at 43–44 (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011)). The GAL continues,

---

[4] As part of her Section 2511(b) argument, Mother argues that "a separate attorney should have been appointed to determine [the C]hildren's expressed desires." Mother's Brief at 15 (citing *In re: L.B.M.*, 156 A.3d 1159 (Pa. 2017) (Pa. 2017)). Mother's Brief at 15.

We are cognizant of the Pennsylvania Supreme Court's recent decision in *In re Adoption of L.B.M.*, wherein the author of the lead opinion, Justice Wecht, stated that 23 Pa.C.S. § 2313(a) requires the trial court to appoint counsel for a child in a termination of parental rights case, and the failure to do so is not harmless error. In part II-B of the lead opinion, Justice Wecht concluded that a trial court is required to appoint counsel to represent a child's legal interests even when the child's guardian *ad litem*, who is appointed to represent the child's best interests, is an attorney. Justice Wecht would hold that the interests are distinct and require separate representation. However, four members of the Court disagreed with this strict application of Section 2313(a). Rather, they opined, in various concurring and dissenting opinions, that separate representation would be required only if the child's best interests and legal interests conflicted.

Read together, *In re Adoption of L.B.M.*, 156 A.3d 1159 (Pa. 2017), and 23 Pa.C.S. § 2313(a), reveal that when the child has legal representation, appointment of separate counsel is necessary only when the parent: 1) demonstrates an actual conflict between the guardian *ad litem's* responsibilities and the interests of the child; and 2) requests separate counsel. A failure to satisfy these requirements results in waiver of this issue.

In the case at hand, Mother did not raise before the trial court any concerns that would have created a need for independent legal counsel for the Children, nor did she make any claims that the guardian *ad litem* failed to properly represent the Children's legal and best interests due to a conflict of interest. In fact, we observe that the GAL zealously represented the Children on both fronts, and that the Children's legal and best interests were not in conflict.

"Being a parent means assuming responsibility so that a real bond develops, not just having a casual relationship with one's children." ***Id.*** at 44 (quoting ***In re J.L.C.***, 837 A.2d 1247, 1249 (Pa. Super. 2003)). Upon the record at hand, we agree with the GAL.

This Court has discussed the requisite analysis pursuant to Section 2511(b) as follows:

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
>> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

***In re Adoption of C.D.R.***, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting ***In re N.A.M.***, 33 A.3d 95, 103 (Pa. Super. 2011)) (quotation marks and citations omitted). "[T]he extent of the bond-effect analysis necessarily depends on the circumstances of the particular case." ***In re Adoption of J.M.***, 991 A.2d 321, 324 (Pa. Super. 2010) (citations omitted). When

evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010) (citations omitted).

In conducting its Section 2511(b) analysis, the trial court recognized that "there exist[s] a loving relationship between Mother and her Children." Trial Court Opinion, 3/10/17, at 9. Nevertheless, the trial court "concluded that the termination of the Mother's parental rights would be in the best interest of the Children pursuant to 23 Pa.C.S.A. § 2511(b) due in part to Mother's inability or refusal to provide the guidance and supervision to address her Children's needs." *Id.* at 9.

As outlined above, our review of the record confirms that terminating Mother's parental rights will best serve the needs and welfare of the Children. As of the termination hearing, the Children had been in foster care for over two years. N.T., 12/19/16, at 7, 119. While the Children have a relationship with Mother, they will not suffer irreparable harm as a result of terminating Mother's parental rights. *Id.* at 42–43, 52. Mother has failed or refused to meet the basic emotional, medical, housing, and educational needs of the Children, let alone address their special medical and educational needs. Contrarily, the foster parents are meeting the basic **and** the special needs of the Children and share a parent-child bond with them. *Id.* at 42. This Court has long recognized that "[a] child's life, happiness

and vitality simply cannot be put on hold until the parent finds it convenient to perform parental duties." ***In the Matter of the Adoption of A.M.B.***, 812 A.2d 659, 675 (Pa. Super. 2002). Thus, we affirm the decrees terminating Mother's parental rights.

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/21/2017