J-A28004-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| IN THE INTEREST OF: J.M.O., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: W.M., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1832 EDA 2019 |

Appeal from the Decree Entered May 29, 2019
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s): CP-51-AP-0000185-2019

| IN THE INTEREST OF: J.O., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| APPEAL OF: W.M., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1833 EDA 2019 |

Appeal from the Order Entered May 29, 2019
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s): CP-51-DP-0002318-2017

BEFORE:   PANELLA, P.J., STABILE, J., and COLINS, J.[*]

MEMORANDUM BY PANELLA, P.J.:                    **FILED FEBRUARY 25, 2020**

W.M. ("Father") appeals from the decree entered May 29, 2019, that granted the petition of the Philadelphia Department of Human Services ("DHS"), and involuntarily terminated his parental rights to his daughter,

_____

[*] Retired Senior Judge assigned to the Superior Court.

J.M.O. (born August 2017) ( "Child" or "the Child").[1]  Father also appeals the order changing Child's permanent placement goal to adoption.  After careful review, we affirm.

The trial court set forth the factual and procedural history of this matter as follows:

> On August 25, 2017, DHS received a General Protective Services (GPS) Report alleging that the Child, J.M.O., and her Mother, T.M.O., tested positive for benzodiazepines and amphetamines at the Child's birth [i]n August [] 2017; that Mother delivered the Child in an ambulance *en route* to Temple University Hospital; that Mother did not have prenatal care; that the Child was born at 35 weeks gestation and weighed five pounds and four ounces; that the Child's APGAR score was unknown; and that the Child was not exhibiting any withdrawal symptoms.  The [r]eport alleged that Mother has an extensive polysubstance abuse history, which includes cocaine, cannabis, benzodiazepine, and amphetamines, dating back 15 years; that Mother also used Adderall and Klonopin; that Mother used crystal methamphetamine one year ago; and that Mother claimed that she stopped using drugs during her pregnancy.  The [r]eport further alleged that Mother received outpatient treatment in 2008; that she is not interested in inpatient treatment, but is willing to participate in outpatient treatment; that Mother has a prior criminal history from 2008, and was incarcerated for four years; that Mother was diagnosed with anxiety and depression in 2008; and that the Child's siblings, Je[.] and Ja[.], are in the care of their [m]aternal [g]randmother, J.O.  This [r]eport was determined as valid.
>
> On August 25, 2017, DHS visited Mother and Child at Temple University Hospital.  During the visit, Mother admitted to DHS that she has a history of drug and alcohol use dating back 15 years.  Mother admitted that she had been using cannabis, Adderall, Klonopin, cocaine, benzodiazepines, and amphetamines.  Mother stated that she last used Adderall on August 21, 2017.

---

[1] Child's mother, T.M.O. ("Mother"), died in December 2018.

\*\*\*

On August 25, 2017, DHS spoke [to] Mother and Maternal Grandmother regarding possible resources for the Child. DHS was provided information for S.W., a family friend, so that she could be considered a possible kinship resource for the Child.

\*\*\*

On August 28, 2017, DHS obtained an [Order for Protective Custody ("OPC")] for the Child and placed her with S.W.

On August 30, 2017, a [h]earing was held before the Honorable Allan L. Tereshko. The OPC was lifted and the temporary commitment to DHS was ordered to stand. The [c]ourt ordered both parents to the Clinical Evaluation Unit (CEU) for a forthwith drug screen and 1 random. The Child was born with substance in [her] system. Child resides in a [k]inship [foster] home with a family friend, S.W., and her home was cleared.

\*\*\*

On February 21, 2018, a Permanency Review Hearing was held before the Honorable Allan L. Tereshko. The [c]ourt ordered legal custody to remain with DHS and placement shall remain in foster care. Paternity tests w[ere] ordered for J.F., and [Father]. The [c]ourt issued a Bench Warrant for Mother. Child is safe as of 2/19/2018.

On May 16, 2018, a Permanency Review Hearing was held before the Honorable Allan L. Tereshko. The [c]ourt ordered legal custody to remain with DHS and placement to continue in Delta Foster Care. The [c]ourt further found that genetic testing ruled out J.F., as the Child's father and confirmed W.M., as [f]ather. W.M., was incarcerated at Federal Detention Center-700 Arch St., Philadelphia, PA 19106. Mother's visits are suspended until she presents herself in Court, and [the] Bench Warrant stands. Child is safe as of 5/14/2018.

On July 25, 2018, a Permanency Review Hearing was held before the Honorable Allan L. Tereshko. The [c]ourt found legal custody of the Child to remain with DHS, and placement to remain in [f]oster [c]are through Delta. Child is doing well in care, and is medically up to date. She is attending daycare. Mother may be

incarcerated. Father is incarcerated. Bench Warrant for Mother remains outstanding. Child may be moved to [the p]aternal [g]randparents['] [("Paternal Grandparents")] home within 24 hours. Forthwith [k]inship referral to be made. Mother's visits remain suspended. Child is safe as of 7/12/2018.

On October 18, 2018, a Permanency Review Hearing was held before the Honorable Allan L. Tereshko. The [c]ourt found legal custody of the Child to remain with DHS, and placement remains in [k]inship [c]are. Mother appeared and [the] Bench Warrant is lifted. Mother referred to CEU for a forthwith drug screen, 2 randoms, assessment and monitoring. If Mother is negative, then she is to have 1 supervised visit with the Child at the Agency for 2 hours per week. Visitation with Father shall occur once cleared by prison officials. CUA was to continue to make outreach to Father in prison. Child is 1 year old and is up to date with medical and immunizations. Safety as of 10/10/2018.

On October 29, 2018, CUA held a revised [Single Case Plan ("SCP")] Meeting. The parental objectives for Father were: 1) participate in and complete [a] parenting program, when appropriate; and upon release from prison 2) attend ARC; 3) obtain and maintain appropriate housing; 4) secure appropriate employment; 5) resolve all legal issues; 6) comply with probation terms; 7) participate in plan for Child, engage, review and sign SCP when provided; 8) visit with Child; and 9) be referred to the CEU for an evaluation. Father did not attend or participate in the SCP Meeting.

On January 16, 2019, a Permanency Review Hearing was held before the Honorable Allan L. Tereshko. Legal [c]ustody to remain with DHS, and placement continues in [k]inship [f]oster [c]are through Turning Points for Children; and Mother died [i]n December [] 2018. Father to have supervised visits once a month at the prison. Child is doing well, and medicals and immunizations are up to date. CUA to explore vol[untary relinquishment] with Father.

On April 3, 2019, a Permanency Review Hearing was held before the Honorable Allan L. Tereshko. The [c]ourt found legal custody of the Child to remain with DHS, and placement remains in [k]inship [c]are with Paternal Grandparents. The Child is one year old, and is up to date with medicals. Father's attorney to reach out to his client (within 10 days) to determine if he is willing

to sign Voluntary Relinquishment Petitions. If willing, then Father's attorney [is] to contact CUA [s]ocial [w]orker to take appropriate paperwork to the prison for Father's signature.

Trial Court Opinion, 8/7/19, at 2-8 (citations to the record omitted).

On March 18, 2019, DHS filed petitions to involuntarily terminate the parental rights of Father to Child and to change Child's permanent placement goal to adoption. In May, the trial court conducted an evidentiary hearing on the petitions.[2] DHS presented the testimony of Shaniqua Wilkerson, the CUA case manager. Father was incarcerated at the time of the hearing and was not present. However, Father was represented by counsel who appeared at the hearing.

At the start of the hearing, DHS's counsel, Attorney Caren Schiffman, informed the court that, at a prior hearing, the court ordered Father's counsel to contact Father to determine if Father wished to voluntarily relinquish his parental rights. *See* N.T., 5/29/19, at 4. Counsel represented that, despite numerous efforts by Wilkerson to contact Father, who was incarcerated at a federal detention facility, Wilkerson was unable to obtain permission to enter the detention facility to see Father. *See id.* Counsel further represented that Wilkerson was in contact with Father's counsel and informed him of this issue. *See id.* At that point, and without any objection from Father's counsel, the

---

[2] At the hearing, Child was represented by a Child Advocate, Lisa Visco, Esquire.

court instructed DHS to proceed with the involuntary termination hearing. ***See id.***

Wilkerson testified that Child was one year old and resided with Paternal Grandparents. ***See id.*** at 5. Child was adjudicated dependent in September 2017, and was placed with Paternal Grandparents in July 2018. ***See id.*** at 7. Wilkerson observed that Child is doing well in their home and Paternal Grandparents are an adoptive resource. ***See id.*** at 7-8. Wilkerson further testified that Child is bonded to Paternal Grandparents and that it would be in Child's best interests to terminate Father's parental rights. ***See id.*** at 8. Wilkerson opined that Child would not suffer irreparable harm if Father's parental rights were terminated. ***See id.***

Wilkerson also testified that she attempted to reach out to Father via phone and letter to discuss voluntarily relinquishing his parental rights, but only spoke to Father's prison counselor. ***See id.*** at 5-6. Wilkerson was unable to make contact with Father. ***See id.*** at 6-7. Wilkerson informed Father's counsel of her difficulty contacting Father. ***See id.*** at 7.

On cross-examination by Father's counsel, Wilkerson acknowledged that Father's counsel told her that a DHS lawyer could visit Father in prison to have Father sign appropriate paperwork to relinquish his parental rights. ***See id.*** at 9. On redirect, Wilkerson testified that, although Father's counsel informed her that a DHS lawyer could go to the detention center, she understood "that's not the procedure. . . ." ***See id.*** at 10.

At the conclusion of the hearing, the trial court entered the decree involuntarily terminating Father's parental rights and the order changing Child's permanent placement goal to adoption. Father timely filed notices of appeal and concise statements of errors complained of on appeal.

On appeal, Father raises the following issues for our review:

1. Did the court violate Father's right to [d]ue [p]rocess when unfairly holding the involuntary termination hearing without his presence in court without good cause in contrary [sic] to its own prior order?

2. Did the court err or abuse its discretion when terminating Father's parental rights involuntarily under § 2511(a) when allowing DHS to withdraw its promise to Father to sign for his voluntary relinquishment of parental rights?

3. Did the court err or abuse its discretion when terminating Father's parental rights involuntarily under § 2511(a) based on insufficient evidence?

Father's Brief at 2.[3]

We review these claims mindful of our well-settled standard of review:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse

---

[3] Father waived any challenge to the goal change order by failing to raise the issue in his Rule 1925(b) statements or his statement of questions involved, and by failing to develop such an argument in his brief. *See In re M.Z.T.M.W.*, 163 A.3d 462, 465 (Pa. Super. 2017) ("[T]his Court will not review a claim unless it is developed in the argument section of an appellant's brief. . . . Further, it is well-settled that issues not included in an appellant's statement of questions involved and concise statement of errors complained of on appeal are waived"). We therefore affirm the goal change order.

- 7 -

of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

We address Father's first and second issues together, as they are interrelated. In his first issue, Father contends that the trial court violated the Pennsylvania Rules of Juvenile Court Procedure and his due process rights by proceeding with the involuntary termination hearing in his absence. *See* Father's Brief at 7-8.[4] Father argues, "DHS here employs the dangling of the voluntary relinquishment in a shield and sword manner with the blessings of the lower court. Hence, the unfair surprise that is fundamentally unfair to Father, a violation of due process." *See id.* at 10-11. Moreover, in Father's second issue, he contends, "DHS must continue with the voluntary relinquishment process." *See id.* at 11. Father argues DHS should be estopped from pursuing an involuntary termination of his parental rights because it is "an act different than the manner in which Father was induced

---

[4] DHS filed a letter with this Court asserting that it "does not oppose the relief requested by Appellant." Letter, 11/8/19. Child's legal counsel filed a brief supporting the involuntary termination of Father's parental rights.

to act, namely he consented to the voluntary relinquishment."[5] ***See id.*** at 11-12.

The trial court addressed Father's issues as follows:

> Father claims this [c]ourt denied him due process by denying his presence in Court for the hearing without good cause. The [c]ourt disagrees and concluded that Father was never denied the opportunity to participate, testify, and present evidence on his own behalf. Ms. Schiffman[, DHS's attorney,] noted that at the last hearing this [c]ourt ordered that Mr. Vo, Father's attorney, was to contact his client to find out if indeed he wished to sign [a] voluntary relinquishment petition and then to notify CUA of that decision. Ms. Wilkerson testified regarding her repeated contact with Mr. Vo, regarding his client, however, Mr. Vo did not respond and instead told her that [a] DHS attorney was to get clearances and see Father, which is not the proper procedure. Father received proper service at the prison of the Petition for Involuntar[y] Termination of Parental Rights filed 3/18/2019. Further, his attorney was present at the hearing and was given the opportunity to present evidence on his behalf.

> ***

> Finally, Father alleges this [c]ourt erred in the involuntary termination of Father's parental rights because DHS is prevented by estoppel to withdraw its offer of the voluntary relinquishment of parental rights. This [c]ourt disagrees. Before the testimony began at the hearing on 5/29/2019, Ms. Schiffman, attorney for DHS, noted that at the last hearing on 4/03/2019, this [c]ourt ordered Mr. Vo, Father's attorney, to contact his client to find out

---

[5] Father also relies on ***Gregury v. Greguras***, 196 A.3d 619, 631 (Pa. Super. 2018), *appeal denied*, 205 A.3d 1230 (Pa. 2019), to support his argument that DHS acted improperly. However, this Court in ***Gregury*** addressed the timing of a party's waiver of the attorney-client privilege, noting "that one party should not be permitted to withhold information from the other party and then surprise that party with it at trial." ***Id.*** at 631. ***Gregury*** is inapplicable here, as this case does not involve the attorney-client privilege, and the testimony established that DHS informed Father's counsel in advance of the termination hearing that it could not contact Father.

if indeed he wished to sign a Voluntary Relinquishment Petition and then to notify CUA of that decision. Ms. Wilkerson testified regarding her repeated contact with Mr. Vo, regarding his client, however, Mr. Vo, advised her that the DHS attorney, was to get clearances and see Father, which is not the proper procedure.

In the instant case, an avenue was available to Father to proceed with voluntary relinquishment of his parental rights if that was his desire, however, neither he[,] nor his attorney, filed a written petition to relinquish his parental rights pursuant to Section 2501(a),[6] or a written petition requesting the permission of the trial court to permanently relinquish his parental rights and duties to Child pursuant to Section 250[4](a).[7] The Voluntary Relinquishment Petition was never filed, and this [c]ourt proceeded on the Petition to Involuntarily Terminate Parental Rights which was filed by DHS on 3/18/2019.

_____

[6] Section 2501(a) provides:

(a) Petition.--When any child under the age of 18 years has been in the care of an agency for a minimum period of three days or, whether or not the agency has the physical care of the child, the agency has received a written notice of the present intent to transfer to it custody of the child, executed by the parent, the parent or parents of the child may petition the court for permission to relinquish forever all parental rights and duties with respect to their child.

23 Pa.C.S.A. § 2501(a).

[7] Section 2504(a) provides:

(a) Petition to confirm consent to adoption.--If the parent or parents of the child have executed consents to an adoption, upon petition by the intermediary or, where there is no intermediary, by the adoptive parent, the court shall hold a hearing for the purpose of confirming a consent to an adoption upon expiration of the time periods under section 2711 (relating to consents necessary to adoption). The original consent or consents to the adoption shall be attached to the petition.

23 Pa.C.S.A. § 2504(a).

Trial Court Opinion, 8/7/19, at 12, 17-18.

Father's claim that his due process rights were violated "is a question of law for which the standard of review is *de novo* and the scope of review is plenary." ***Commonwealth v. Tejada***, 161 A.3d 313, 317 (Pa. Super. 2017) (citation omitted). "Due process requires that the litigants receive notice of the issues before the court and an opportunity to present their case in relation to those issues." ***Brooks–Gall v. Gall***, 840 A.2d 993, 997 (Pa. Super. 2003) (citation omitted). "It is well settled that procedural due process requires, at its core, adequate notice, opportunity to be heard, and the chance to defend oneself before a fair and impartial tribunal having jurisdiction over the case." ***S.T. v. R.W.***, 192 A.3d 1155, 1161 (Pa. Super. 2018) (citation and internal quotation marks omitted). "The right of a litigant to in-court presentation of evidence is essential to due process; in almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses." ***M.O. v. F.W.***, 42 A.3d 1068, 1072 (Pa. Super. 2012) (citation omitted).

However,

> In order to preserve an issue for appellate review, a party must make a timely and specific objection at the appropriate stage of the proceedings before the trial court. Failure to timely object to a basic and fundamental error will result in waiver of that issue. On appeal the Superior Court will not consider a claim which was not called to the trial court's attention at a time when any error committed could have been corrected. In this jurisdiction . . . one must object to errors, improprieties or irregularities at the earliest possible stage of the adjudicatory process to afford the jurist

hearing the case the first occasion to remedy the wrong and possibly avoid an unnecessary appeal to complain of the matter.

***Thompson v. Thompson***, 963 A.2d 474, 475–476 (Pa. Super. 2008) (citation omitted).

We conclude that Father waived his argument that the trial court erred by conducting the termination hearing in his absence. Father was represented throughout the termination proceedings by counsel. Counsel appeared for the termination of parental rights hearing, and permitted the hearing to proceed, in Father's absence, without any objection. The first time that Father objected to his absence at the hearing was in Father's Rule 1925(b) statements. Father's failure to timely raise this issue results in waiver.

Father's also claims the trial court violated the doctrine of equitable estoppel by allowing involuntary termination after Father had allegedly agreed to voluntarily relinquish his parental rights. The doctrine of equitable estoppel is one of "fundamental fairness, designed to preclude a party from depriving another of a reasonable expectation when the party inducing the expectation albeit gratuitously knew or should have known that the other would rely on that conduct to his detriment." ***Jacob v. Shultz-Jacob***, 923 A.2d 473, 480 (Pa. Super. 2007) (citation omitted). It "prevents one from doing an act differently from the manner in which another was induced by word or deed to expect." ***Bonds v. Bonds***, 689 A.2d 275, 278 (Pa. Super. 1997) (citation omitted).

The essential elements of equitable estoppel are "inducement and justifiable reliance on that inducement exhibited by a change in one's condition to his or her detriment." *Id*. (citation omitted). "One who asserts equitable estoppel must prove the elements by clear, precise and unequivocal language." *Id*. (citation omitted).

We conclude the trial court did not err in conducting the termination hearing despite Father's purported intention to voluntarily relinquish his parental rights. The record reveals that Wilkerson made Father's counsel aware of her inability to enter the federal detention facility to have Father execute the documents necessary for Father to voluntarily relinquish his parental rights. As correctly determined by the trial court, once Wilkerson provided this information to Father's counsel, it was necessary for Father and his counsel to "proceed with voluntary relinquishment of his parental rights if that was his desire. . . ." *See* Trial Court Opinion, 8/7/19, at 18.

However, it is apparent that, in the face of the information conveyed by Wilkerson, Father did nothing. Wilkerson conveyed the necessary information to Father's counsel, and Father cannot claim that he justifiably relied on DHS continuing to pursue the voluntary relinquishment of his parental rights. Thus, DHS was not estopped from proceeding with the involuntary termination hearing. Accordingly, Father's first two issues do not merit relief.

We now turn to Father's challenge to the trial court's findings pursuant to 23 Pa.C.S.A. § 2511(a)(1). Termination of parental rights is governed by

Section 2511 of the Adoption Act, 23 Pa.C.S.A. § 2101-2938, which requires

a bifurcated analysis:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Here, the trial court terminated Father's parental rights pursuant to 23

Pa.C.S.A. § 2511(a)(1) and (b).

We have explained this Court's review of a challenge to the sufficiency

of the evidence to support the involuntary termination of a parent's rights

pursuant to Section 2511(a)(1) as follows:

> To satisfy the requirements of Section 2511(a)(1), the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties. In addition,
>
> > Section 2511 does not require that the parent demonstrate both a settled purpose of relinquishing parental claim to a child and refusal or failure to perform parental duties. Accordingly, parental rights may be terminated pursuant to Section 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing parental claim to a child or fails to perform parental duties.

Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*In re Z.S.W.*, 946 A.2d 726, 730 (Pa. Super. 2008) (internal citations omitted).

. . . . Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

[I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting

*In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011) (quotation marks and

citations omitted).

- 15 -

In addressing Section 2511(a)(1), the trial court reasoned that termination of Father's parental rights was appropriate, observing:

This [c]ourt heard credible, persuasive evidence from Shaniqua Wilkerson, CUA Case Manager, who testified the Child was removed from Mother's care at birth, adjudicated [d]ependent, and placed in [f]oster [c]are on 9/06/2017. Mother had a history of illegal drug use and overdosed in December 2018. The [f]ather was identified by genetic testing in May 2018, was incarcerated and remains in prison and was never involved in the Child's care.

Ms. Wilkerson testified that W.M. was identified to be the biological Father by genetic testing and on 10/29/2018, CUA held a revised SCP Meeting. The parental objectives for Father were: 1) participate in and complete parenting program, when appropriate; and upon release from prison 2) attend ARC; 3) obtain and maintain appropriate housing; 4) secure appropriate employment; 5) resolve all legal issues; 6) comply with probation terms; 7) participate in plan for [C]hild, engage, review and sign SCP when provided; 8) visit with Child; and 9) be referred to the CEU for an evaluation. Father did not attend or participate in the SCP Meeting.

The evidence here is clear and convincing that DHS and the placement agency made all reasonable efforts to reach out to Father by telephone and by letters at the prison. His lack of action demonstrates his inability to care for the Child now and in the future. The [c]ourt found the Child has a right to have proper parenting and fulfillment of her potential in a permanent, healthy, and safe environment. She has a present and future need for essential parental care which is necessary for her physical and mental wellbeing.

The Superior Court has noted that a parent has an affirmative duty to love, protect and support his child and to make an effort to maintain communication and association with that child. Father's incarceration made his performance of this duty more difficult, however, incarceration alone cannot be grounds for termination under any provision of § 2511(a). Father's absence and/or failure to support due to incarceration is not conclusive on the issue of abandonment. Nevertheless, this [c]ourt cannot

completely toll Father's responsibilities during his incarceration. This [c]ourt inquired whether Father had utilized the resources available to him in prison to continue or commence a parental relationship with the Child, and concluded that he has not. This [c]ourt found that Father's conduct for at least the six months prior to the filing of the Termination Petition, established a settled purpose of relinquishing parental claim to the Child and revealed a failure to perform parental duties. Based on the clear and convincing evidence presented, this [c]ourt terminated Father's parental rights pursuant to 23 P[a].C.S.A. § 2511(a)(1).

Trial Court Opinion, 8/7/19, at 14-15.

Here, Father does not seriously contest that he failed or refused to parent Child throughout her life. Indeed, he acknowledges that the petition met the six month "look back period [pursuant to Section 2511(a)(1)] by just one day. . . ." **See** Father's Brief at 13. Instead, Father insists he should be given more time because DHS "really began offering visits to Father only two months and twelve days before the date of the filing of the petition." **See id.** Given Father's concession, and the testimony of Wilkerson that Father never contacted her and that Child is thriving in Paternal Grandparents' care, we conclude that the trial court did not abuse its discretion in terminating Father's parental rights pursuant to Section 2511(a)(1).[8]

---

[8] Father waived any challenge to the trial court's findings pursuant to Section 2511(b) by not raising the issue in his Rule 1925(b) statements, his statement of questions involved, or his brief. **See In re M.Z.T.M.W.**, 163 A.3d at 462 (finding the appellant waived her challenge to Section 2511(a) by failing to develop a supporting argument in her brief and waived her challenge to Section 2511(b) by failing to include it in her concise statement and statement of question involved section of her brief). Nevertheless, had Father preserved the issue, it would not merit relief. There is no evidence that Father had any contact with Child throughout her life. In Father's absence, Child has been well cared for by Paternal Grandparents. Paternal Grandparents are a pre-

For the foregoing reasons, we affirm the decree involuntarily terminating Father's parental rights to Child, and the order changing Child's permanent placement goal to adoption.

Decree affirmed. Order affirmed.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/25/20

---

adoptive resource, and Child is bonded to them. Accordingly, the termination of Father's parental rights best meets Child's needs and welfare pursuant to Section 2511(b).