J-S15016-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT OP 65.37**

| | | |
|---|---|---|
| IN RE: TERMINATION OF PARENTAL RIGHTS TO C.J., A MINOR | : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: D.M.H., MOTHER | : : : : : : : : | |
| | : | No. 1614 MDA 2022 |

Appeal from the Order Entered October 24, 2022
In the Court of Common Pleas of Centre County
Orphans' Court at No: 2022-4594 A

BEFORE: BOWES, J., STABILE, J., and SULLIVAN, J.

MEMORANDUM BY STABILE, J.:      **FILED: JUNE 27, 2023**

D.M.H. ("Mother"), appeals from the October 24, 2022 decree granting the petition filed by Centre County Children and Youth Services ("CYS") to involuntarily terminate her parental rights to her son, C.J. ("Child"), born in November 2015.[1] We affirm.

We glean the relevant facts and procedural history from the certified record. CYS became aware of this family in 2008 due to concerns over Mother's substance abuse after she gave birth to her first child. N.T., 10/20/2022, at 90. CYS obtained emergency protective custody of the child, and after reunification attempts were unsuccessful, Mother's parental rights

_____

[1] By separate decree entered on the same date, the orphans' court voluntarily terminated the parental rights of biological father, J.E.J. Father did not file a notice of appeal or participate in the instant appeal.

were involuntarily terminated. *Id.* Four years later, in June 2012, Mother gave birth to her second child. *Id.* CYS did not provide services because the second child was, ultimately, privately adopted. *Id.* at 90-91.

Thereafter, CYS became involved with the family again in April 2016, when Child was six months old. *Id.* at 91. CYS learned that Mother was leaving Child alone and not supervising him properly. *Id.* CYS offered Mother parenting services, but she failed to participate in the suggested programs. *Id.* CYS contacted paternal grandparents who filed for, and were awarded, emergency custody of Child.[2] *Id.* at 91-92.

In October 2020, when Child was almost five years old, CYS received a report regarding concerns over paternal grandparents' substance abuse, home conditions, domestic violence, and mental health. *Id.* at 93. CYS conducted an investigation, and Child divulged that paternal grandfather is mean and that his grandfather choked him. *Id.* at 94. However, according to Dylan James, CYS caseworker, it was difficult to speak with Child because he was developmentally delayed and was still wearing diapers. *Id.*

Casey Lea Rockey, licensed clinical social worker and Child's therapist, testified regarding his developmental delays.

---

[2] During the custody matter, CYS again offered Mother parenting services. N.T., 10/20/2022, at 92. However, Mother still did not participate in the services. *Id.* Additionally, at this time, CYS became concerned with Mother's use of marijuana. *Id.*

At the time of the initial referral and prior to my involvement, [Child] was not yet potty-trained. His speech was delayed. He was often observed doing behaviors that [] are referred to as stimming. He would clap his hands, spin, and engage in repetitive behaviors. He also struggled to regulate his emotions and engage in appropriate behaviors. He was what [Child] calls and the team working with him call humping when he was distressed, meaning he would thrust his pelvic area against things, stuffed animals, the bed, to self-soothe[.]

*Id.* at 12. Ms. Rockey also stated that Child is borderline intellectually disabled and has trouble focusing. *Id.* at 15.

CYS obtained emergency custody of Child on October 26, 2020. Following a shelter care hearing on October 29, 2020, Child remained in the care and custody of CYS. *Id.* at 95. CYS determined that, at that time, Child could not be placed with Mother because she had very limited, if any, contact with him. CYS also had concerns regarding Mother's mental health and her history with CYS. *Id.* at 96. The court adjudicated Child dependent in January 2021. *Id.* at 95. On January 25, 2021, he was placed with pre-adoptive foster parents. *Id.* at 48.

In March 2021, Child began therapy for behavioral challenges, intellectual delays, and developmental delays with Ms. Rockey, who concluded Child had suffered significant trauma and diagnosed him with Post-Traumatic Stress Disorder ("PTSD"), and disassociation. *Id.* at 11-12, 15-16. Ms. Rockey described disassociation as follows:

[T]he easiest way to describe [disassociation], is everyone disassociates on some level, and if you think of it in terms of you're driving your car home from work, you get out of your car, and you're, oh, my goodness, I don't even remember driving to work,

so your body is clearly doing what it's supposed to do, but your brain has checked out.

[Child] experiences that in a clinical way. He disassociates and his brain checks out more frequently than normal to a clinical level[.]

*Id.* at 16-17. Ms. Rockey attributed Child's diagnosis to "issues of abuse and neglect throughout [Child's] life leading up to the removal of [Child] by [CYS.]" *Id.* at 15. Further, Ms. Rockey testified that Mother did not recognize "that Child's behaviors were not normal." *Id.*

During her testimony in this matter, Ms. Rockey emphasized that it is imperative for Child's caregivers to understand his trauma triggers, trauma responses, and the behaviors that he experiences when he is confronting his trauma because "every time [Child] is triggered, he gets into either a hypo[-]arousal state, which is like a freeze state, or a hyper[-]arousal state, which is the fight state, so you might see him bouncing off the chair." *Id.* at 17. For example, Ms. Rockey testified that Child sometimes "does a laugh that is clearly not a fun laugh[,]" and then he freezes which signals Child is distressed. *Id.*

In furtherance of Child's permanency goal of reunification, Family Intervention Crisis Services ("FICS") provided Mother with the following reunification goals: (1) provide a stable, consistent, and healthy lifestyle; (2) demonstrate the ability to support herself and Child; and (3) promote the healthy growth and development of Child. *Id.* at 103.

FICS provided Mother with educational sessions to teach her about the trauma Child experienced, his unique emotional needs, and techniques to utilize when he is distressed. *Id.* at 105-106. For example, Mother was taught a deep-breathing technique to use when Child becomes distressed. *Id.* at 28. Ms. Rockey also met with Mother to educate her on these topics.[3] *Id.* at 25-26. Ms. Rockey and Tara Chappell, reunification counselor at FICS, testified that Mother displayed minimal growth as she was not consistently attuned to Child's needs or able to recognize when Child was in distress. *Id.* at 28-30, 117.

On August 17, 2022, CYS filed for the involuntary termination of Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b). The orphans' court conducted an evidentiary hearing on October 20, 2022, when Child was six years old, wherein he was represented by a guardian *ad litem* ("GAL") and separate legal counsel.[4]

---

[3] Ms. Rockey met with Mother ten times between May 2021 and August 2022. N.T., 10/20/2022, at 28. Mother did not start regularly meeting with Ms. Rockey until July 2022. *Id.* at 26.

[4] The GAL filed a brief in support of termination of Mother's parental rights.

CYS presented the testimony of Ms. Rockey, licensed clinical social worker,[5] Mr. James, CYS caseworker, and Ms. Chappell. Mother was represented by counsel and testified on her own behalf.

By decree dated October 20, 2022, and entered October 24, 2022, the court involuntarily terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b). On November 18, 2022, Mother timely filed a notice of appeal and concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The orphans' court filed a Rule 1925(a) opinion on November 30, 2022.

On appeal, Mother presents the following issues for review:

1. Did the lower [c]ourt err in involuntarily terminating Mother's parental rights where CYS did not prove by clear and convincing evidence all of the elements required to effectuate an involuntary termination pursuant to 23 Pa.C.S.A. [§] 2511(a)(2)?

2. Did the lower [c]ourt err in involuntarily terminating Mother's parental rights where CYS did not prove by clear and convincing evidence all of the elements required to effectuate an involuntary termination pursuant to 23 Pa.C.S.A. [§] 2511(a)(5)?

3. Did the lower [c]ourt err in involuntarily terminating Mother's parental rights where CYS did not prove by clear and convincing evidence all of the elements required to effectuate an involuntary termination pursuant to 23 Pa.C.S.A. [§] 2511(a)(8)?

---

[5] Mother's counsel stipulated that Ms. Rockey is an expert in the field of licensed clinical social work and trauma therapy. N.T., 10/20/2022, at 19.

4. Did the lower [c]ourt err in involuntarily terminating Mother's parental rights where CYS did not prove by clear and convincing evidence all of the elements required to effectuate an involuntary termination pursuant to 23 Pa.C.S.A. [§] 2511(b)?

Mother's Brief at 4.

Our standard of review in this context is well-settled:

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record. Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion.

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*Interest of M.E.*, 283 A.3d 820, 829-30 (Pa. Super. 2022) (internal citations and quotation marks omitted).

- 7 -

The involuntary termination of parental rights is governed at statute by 23 Pa.C.S.A. § 2511 of the Adoption Act, which necessitates a bifurcated analysis that first focuses upon the "eleven enumerated grounds" of parental conduct that may warrant termination pursuant to Section 2511(a)(1)-(11). **M.E.**, **supra** at 830. If the court determines that a petitioner has established grounds for termination under at least one of these subsections by "clear and convincing evidence," the court then assesses the petition under Section 2511(b), which focuses primarily upon the child's developmental, physical and emotional needs and welfare. **Id.** at 830 (citing **In re T.S.M.**, 71 A.3d 251, 267 (Pa. 2013)); **see also** 23 Pa.C.S.A. § 2511(b). This Court "need only agree with any one subsection of § 2511(a), in addition to § 2511(b), in order to affirm the termination of parental rights." **M.E.**, **supra** at 830 (citing **In re B.L.W.**, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*)).

Our analysis in this proceeding implicates Section 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .

- 8 -

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

Pursuant to Section 2511(a)(2), the party petitioning for termination must establish: (1) repeated and continued incapacity, abuse, neglect or refusal by the parent; (2) which caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. *See In re Adoption of A.H.*, 247 A.3d 439, 443 (Pa. Super. 2021) (citing 23 Pa.C.S.A. § 2511(a)(2)). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re S.C.*, 247 A.3d 1097, 1104 (Pa. Super. 2021) (quoting *In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa. Super. 2015)) (internal citation omitted).

Mother argues that she was making sufficient progress toward resolving the issues that led to Child's placement. Mother's Brief at 14. She contends that she remedied most of the problems and the court should have allowed

her to continue to resolve any remaining issues. *Id.* at 14-15. Mother refers to her own testimony regarding her progress and submits that even CYS and FICS agree that she had obtained stable housing. *Id.* at 23. She further argues that despite incomplete budget sheets, she has always been able to pay her bills. *Id.* Mother concludes that nearly all the conditions that led to Child's placement have been remedied and she should be allowed to continue her progress on any perceived outstanding issues. *Id.* at 24.

Mother's arguments are unpersuasive. In determining that CYS met its burden by clear and convincing evidence, the orphans' court stated the following:

> Mother has demonstrated an inability to appropriately care for the physical, emotional, and mental well-being of [] Child. Prior to [Child's] removal from the [paternal] grandparents' home . . . emergency custody was awarded to [paternal] grandparents due to Mother's [] inability or unwillingness to provide for the basic care and supervision of [] Child through her actions and her refusal to act in Child's best interest. Mother was offered a number of services including reunification services, for over a year in order to improve and demonstrate her ability to properly care for [] Child. Although Mother regularly attended meetings and visits with [] Child, she repeatedly failed to make any significant progress with respect to the therapeutic techniques necessary to help [Child] self-regulate and live in a safe, consistent environment. Mother also failed to progress through her own therapy, ceasing her attendance in July 2022. During visits with [Child], Mother struggled to appropriately recognize [Child] as a traumatized child. To this end, Mother was never able to move to fully unsupervised visits with [Child]. Mother has exhibited an inability to appropriately engage with and care for [Child], given his unique and demanding needs.
>
> . . .

- 10 -

> Mother has failed to recognize the problems which led to [Child's] placement and never took significant action to remedy the concerns CYS and FICS had about [Child] remaining in or returning to Mother's care, save for rectifying the agencies' concern regarding appropriate housing. Mother did not properly avail herself of the services offered by the agencies, and failed to show she had made progress in reaching goals necessary for reunification. Mother did not sufficiently progress in her goals or show improvement in her parenting ability.

Orphans' Court Opinion, 11/30/2022, at 6-7.

The certified record supports the orphans' court's findings. Ms. Rockey testified that Child's caregivers need to be attuned to his emotional needs "24 hours a day, seven days a week." N.T., 10/20/2022, at 17-18. She further stated that Child "needs a home that is going to create a sense of stability, predictability, and consistency. [H]e needs structure." *Id.* at 19. Without stability, Ms. Rockey testified that Child will carry his trauma into adulthood. *Id.* at 22-23.

CYS and FICS provided Mother with ample opportunities to remedy her inability to properly parent Child. Mother attended sessions offered by FICS. N.T., 10/20/2022, at 104. She also attended sessions with Child's therapist, Ms. Rockey, *albeit* on a more limited basis, notwithstanding Ms. Rockey's recommendation that she attend more frequently.[6] *Id.* at 26. Despite these efforts, Ms. Rockey and Ms. Chappell, reunification counselor at FICS, stated

---

[6] Mother did not begin weekly sessions with Ms. Rockey until July 2022, after she stated that "it would be contrary to [Child's] health and well-being to return to [Mother]. N.T., 10/20/2022, at 50.

- 11 -

that Mother made minimal, inconsistent progress in identifying Child's triggers and responding appropriately when Child feels distressed. *Id.* at 28, 60-61, 117.

Ms. Rockey stated that Mother took "copious notes" during their sessions, but she struggled to implement the techniques. *Id.* at 26. She indicated that Mother began to acknowledge that Child was traumatized, but she was not able to "create a safe environment where [Child] could have his needs met." *Id.* at 28-29, 82-85. Ms. Rockey explained:

> Healthy, well-adjusted, resilient, cared-for children think, my mom is going to meet my needs, my dad is going to meet my needs, I'm safe, I'm loved, I'm cared for. [Child] does not think that way. [Child] thinks, I'm not worthy, I'm not going to get my needs met, I'm not cared for, I'm not safe, even in situations where every other person in the room can see that [Child] is safe . . . and then you see those trauma behaviors and those responses from [Child].

*Id.* at 22.

Ms. Rockey testified that although Mother began to attend therapy more regularly in July 2022, "[she still] wasn't able to recognize trauma responses, the trauma triggers, wasn't able to consistently be attuned to [Child's] needs[.]" *Id.* at 26. Ms. Rockey identified "baby talk" as a trauma trigger that would cause Child to disassociate, but Mother could not consistently refrain from using it. *Id.* at 34. Additionally, when Child would disassociate, she "wasn't able to use any of the grounding techniques to help [Child] come out of the disassociation[.]" *Id.* at 34-35.

Ms. Chappell confirmed that Mother still struggles with using baby talk, "which then causes [Child] to regress throughout the entirety of the visit." *Id.* at 114. Ms. Chappell further stated that Mother could not consistently utilize regulating and calming techniques with Child. *Id.* at 113. Ms. Chappell stated the following on direct examination regarding Mother's progress:

> Q: How would you describe or characterize [Mother's], through services you have offered, her progress in meeting [Child's] needs at visits?
>
> A: I would say it's been minimal. We got [Mother] to a point where she was able to recognize when [Child] is getting hyper[-]aroused or hypo[-]aroused, but really struggles to be consistent at this, same with implementing the calming techniques or the grounding techniques. At times, she's able to do it, but she's struggled with being consistent. Staff always had to be active in the visits to really help [Child] coregulate.

*Id.* at 117.

Mother also never progressed beyond supervised visits. *Id.* at 119. Visits were initially two hours but were decreased to one hour "in an attempt to help [Mother] create [a] safe holding environment for Child, [but] that never happened." *Id.* at 29. Ms. Rockey also testified as follows on cross-examination:

> Q: Have [visits] ever taken place at all in [Mother's] home?
>
> A: Absolutely not.
>
> Q: Well, you say absolutely not. Is there some reason why that could not be tried to see how [Child] would react to the home environment that she would provide for him if he were returned to her?

A: As [Child's] therapist, I would not suggest that, because even in a neutral location, she has not been able to create a safe, predictable environment. So, in a home, I would not encourage or recommend that, given [Child's] therapeutic needs.

*Id.* at 49. For example, as related *supra*, Mother would trigger Child by baby talking. Thereafter, she was not able to utilize the techniques to ground Child. *Id.* at 33-35.

Commencing in November 2021, Mother began attending therapy on a monthly basis. *Id.* at 77, 107. Ms. Rockey and Ms. Chappell encouraged Mother to attend therapy more often. *Id.* at 77, 107. Ms. Rockey also told Mother she wanted to speak with her therapist to discuss Child's needs, but she never heard from the therapist or Mother to schedule the conversation. *Id.* at 78. Ms. Rockey stressed to Mother that she "work on managing her anxiety and work on her trauma history so that she could be more aware and attuned to [Child and create] a healthy attachment with [him]." *Id.* at 27. At some point prior to July 2022, Mother began seeing her therapist weekly. *Id.* at 107. However, in July 2022, Mother ceased therapy altogether, which, as best we can discern, resulted in her discharge. *Id.*

Finally, on direct examination, Ms. Rockey testified that she does not believe Mother will be able to provide Child with a stable environment.

Q: Based on your work in this matter, your experience with everything in this case, how much time would be required for [Mother] to get to the point of being able to provide this safe, stable, predictable and consistent environment for [Child]?

A: I don't know that she can ever get there unless and until she learns to manage her anxiety and resolves her trauma, and

- 14 -

outside of that, what I talked with [Mother] about is, I don't -- more importantly for me, I don't see [Child] ever getting there to feel safe and secure with her if those things don't change, and unfortunately, in almost two years, that hasn't changed. I believe [Child] will be in placement two years and maybe five days around October 25, if I recall, and so, in two years, [Mother was not] able to make progress to make him even feel safe, let alone attach and form a healthy attachment to [her].

*Id.* at 46-47.

Based on the foregoing, we discern no abuse of discretion by the orphans' court in concluding that Mother's minimal progress warrants termination pursuant to Section 2511(a)(2). The record demonstrates that Mother's repeated and continued inability to properly identify Child's triggers and to properly implement the necessary techniques when parenting Child has caused Child to be without essential parental care, control, or subsistence necessary for his physical and mental well-being. Further, the cause of Mother's incapacity cannot or will not be remedied.

Turning to Section 2511(b), we are required to "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b). It is well-established that this inquiry "requires the trial court to consider the nature and status of bond between a parent and child." *M.E.*, *supra* at 837 (citing *In re E.M.*, 620 A.2d 481, 484-85 (Pa. 1993)). "When examining the effect upon a child of severing a bond, courts must examine whether termination of parental rights will destroy a 'necessary and beneficial relationship,' thereby causing a child to suffer 'extreme emotional consequences.'" *In re Adoption of J.N.M.*, 177 A.3d

937, 944 (Pa. Super. 2017) (quoting **E.M.**, **supra**, at 484-485). However, the "bond examination" is only one amongst many factors to be considered in assessing the soundness of termination:

> In addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. In determining needs and welfare, the court may properly consider the effect of the parent's conduct upon the child and consider whether a parent is capable of providing for a child's safety and security or whether such needs can be better met by terminating a parent's parental rights.

**M.E.**, **supra** at 837 (internal citations omitted).

Mother argues that her testimony evidences a strong bond between her and Child. Mother's Brief at 25. She contends that she loves Child, that he calls her "Mommy," and that termination of her parental rights would make him sad. **Id.** at 25-26. Accordingly, Mother concludes that CYS did not provide clear and convincing evidence that termination would best serve the developmental, physical, and emotional needs and welfare of Child pursuant to 23 Pa.C.S.A. § 2511(b). **Id.** at 30.

The orphans' court determined that foster parents have provided Child with a stable and loving environment. Orphans' Court Opinion, 11/30/2022, at 9. The court stated that "Mother has failed to make significant progress in attuning to and addressing [Child's] special needs, [while] the foster parents have been consistently successful in utilizing the therapeutic techniques

- 16 -

necessary to provide [Child] with safety and stability." ***Id.*** at 10. The court

concluded the following:

> In this case, terminating Mother's parental rights would not destroy any existing, necessary or beneficial relationship for [Child]. [Child] has not been in Mother's care without supervision for at least twenty-two months since [Child's] removal from his [paternal] grandparents' home and for a considerable amount of time prior to removal. Terminating Mother's parental rights will not cause irreparable harm . . . and any possible harm can be dealt with through services provided by CYS and cooperation with the foster parents.

***Id.*** at 9.

We discern no abuse of discretion. As related ***supra***, "[Mother was not]

able to make progress to make [Child] even feel safe, let alone attach and

form a healthy attachment to [her]." N.T., 10/20/2022, at 47. Importantly,

Ms. Rockey testified:

> I don't see any detriment to [Child] therapeutically if that were to happen. [Child] really identifies his foster parents as his family. . . [Child] doesn't ask to see [Mother] and [Father]. In fact, he talks about not liking going to visits, that he doesn't like the way it feels . . . ."

***Id.*** at 41. Conversely, Ms. Rockey stated that she has concerns if termination

is not granted because "[h]e needs permanency. He needs to know, I'm going

to be in this place and I'm going to be safe every day." ***Id.*** at 42.

Ms. Rockey further stated that Child feels safe with his foster parents as

follows:

> It was a challenge, and the foster parents put in a lot of time and energy helping [Child] to understand that he's safe and that they are going to love him and take care of him while he was in their home, and they brought him to therapy, participated in therapy,

- 17 -

and we're not talking one time a week. Like, they are going to therapy two times a week, and that's specific for [Child].

*Id.* at 19. On direct examination, Ms. Chappell confirmed that foster parents make Child feel safe and that termination of Mother's parental rights is best for Child's needs. She explained:

Q: Has your agency had the opportunity to observe [Child] with his foster family?

A: Yes.

Q: What have your observations been?

A: During those visits, [Child] often remains calm. During times that he does get overstimulated and things -- the foster parents are, you know, consistent at stepping in to promote those coregulation techniques, if needed, to make sure that he's able to regulate his emotions.

Q: So[,] it's not a scenario where [Child] is now a perfect child or the foster family perfectly addresses all of his needs, but they're able to utilize what they have learned in order to help him feel he has that safe space?

A: Yes.

Q: Does your agency have any concerns about the foster family's ability or willingness to continue to do this in the future for any of [Child's] ever-changing needs?

A: No, they always advocate for [Child] and his needs.

Q: Does your agency believe that termination and adoption would be in [Child's] best interest?

A: Yes.

Q: Why?

A: You know, [Child] struggles . . . with having a safe and secure environment. That's something that we were never able to get to

with [Mother] through the meetings and the visits. You know, with a two-hour visit, [Mother] still struggles with baby talking at pretty much every visit, which causes [Child] to regress. He needs the stability and consistency in order to . . . continue working on his trauma history and things like that.

*Id.* at 121-122. Consequently, Mother's argument fails, and the orphans' court did not abuse its discretion in determining that termination best serves Child's developmental, physical, and emotional needs and welfare pursuant to Section 2511(b).

Based on the foregoing, we affirm the decree terminating Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2) and (b).

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 06/27/2023